[Crim. No. 6016. Second Dist., Div. One. Sept. 2, 1958.]

THE PEOPLE, Respondent, v. CHARLES FREDERICK NEELY et al., Defendants; NORMAN W. GOLLAND, Appellant.

Ernest L. Graves, under appointment by the District Court of Appeal, and William J. Clark for Appellant.

Edmund G. Brown, Attorney General, and Joe J. Yasaki, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal from the judgments and sentences rendered after verdicts of guilty by a jury, wherein the appellant was charged with and convicted of robbery and murder.

In an information filed in Los Angeles County, the co-defendant Neely and appellant Norman W. Golland, were charged in count I with robbery in that they did about December 28, 1956, while armed with a deadly weapon, by force and fear, take $14 from the person and immediate presence of Vera Kaloostian. In count II Neely and appellant were charged with murdering Joseph Walter Leopold.

It was alleged in the information that Neely had previously been convicted of forgery in about 1956, and had served a term in the federal prison therefor, and had been convicted of robbery in Los Angeles County in about 1952, and had served a term in the state prison therefor. It was alleged that Golland had previously been convicted of forgery of a fictitious name in about 1951, and robbery in about 1952, and had served separate terms in the state prison for each of said offenses. On February 20, 1957, Neely denied the prior convictions and entered pleas of not guilty and not guilty by reason of insanity, and three doctors were appointed pursuant to the provisions of section 1027, Penal Code, to examine Neely and report to the court. On February 20, 1957, appellant entered a plea of not guilty to the charges and stood mute as to the prior convictions. The court thereupon, for the record, entered up a denial of the prior convictions. The appellant made a motion for a separate trial and such motion was denied.

On May 8, 1957, the case started to trial and Neely withdrew his plea of not guilty and not guilty by reason of insanity as to count II and entered a plea of guilty of murder in the first degree and admitted the two prior convictions. It was stipulated that the court might read and consider the reports of the doctors filed in the case in considering judgment. The time of sentencing Neely was continued to May 22, 1957.

Appellant made a motion to dismiss count II as to him, and such motion was denied. He then made a motion to compel the prosecution to elect as to which count it would proceed upon, and that motion was also denied. The appellant then admitted the prior convictions.

The jury found the appellant guilty of robbery in the first degree, and also found that he was armed at the time of the commission of the offense. The jury also found appellant guilty of murder in the first degree and recommended punishment by imprisonment in the state prison for life. A motion for a new trial was made and denied, and appellant was sentenced. The appeal to be considered is from the judgment of conviction and from the order denying appellant's motion for a new trial.

A résumé of the testimony is as follows: Neely resided in Bakersfield and was employed as a roustabout by an oil company. At one time he owned a 1951 model Ford automobile, but he was involved in an accident with that car about December 19, 1956, in which accident he had his jaw injured and was hospitalized thereafter for several days. After he got out of the hospital, but before December 27, 1956, he borrowed, on two or three occasions, for not more than an hour or so on each occasion, a 1951 model Plymouth automobile (California license number FER 866) from a friend, Mrs. Frances Leard. About 1:30 o'clock p. m., Thursday, December 27, he borrowed the Plymouth car from Mrs. Leard, stating that he was going to Los Angeles. In the late afternoon of December 27, 1956, Neely registered at the Grant Hotel on Sunset Boulevard in Los Angeles, under the name of Ron Allard, and as being from Minneapolis, Minnesota. About 6:15 o'clock of that same day he left the hotel and about an hour later returned with the appellant. When they entered the hotel Neely went to a telephone which was attached to the wall and looked at the classified section of the telephone book. During this time the appellant was close by the hotel clerk, who testified positively that the appellant was with Neely at that time. Neely and the appellant then went to Neely's room. The hotel clerk worked on his regular shift until 5 o'clock a. m. of Friday, December 28, 1956, but he did not see either Neely or the appellant leave the hotel during the night or early morning.

About 7:15 o'clock p. m., December 28, 1956, Mrs. Vera Kaloostian was working at a check stand in a Safeway grocery store, located at 1921 North Wilcox, Los Angeles. As she was sacking some grocery items for Joseph W. Leopold she noticed

a man, wearing a hat and mask and dressed in army khaki clothes and holding a gun, enter the store. The mask was of black silk material and it covered the face of the man wearing it from the eyes down. The man walked up to Mrs. Kaloostian and said, "This is a holdup; open the register;" whereupon she responded by unlocking the register. The drawer opened and the man reached into it and took out "a few bills."

The robber then started to leave and as he did so Mr. Leopold picked up a can and threw it at him. The checker then heard a shot and a "whiz-like, or something" right beside her ear. She called for help from the management.

There was uncontradicted evidence that Leopold was struck in the head by a bullet and died from the wound he so received. An officer stated that he arrived at the store about 7:15 o'clock p. m. and saw a man who was later identified as Leopold, lying in the aisle of one of the check stands.

Shortly after 7 o'clock p. m. on December 28, 1956, Miss Janet Parker was riding in a car driven by her brother in a southerly direction on Wilcox Avenue, in the block where the Safeway store heretofore mentioned is located. As they passed the store she saw a masked man, holding a shining object in his hand, run from the store into the parking lot which immediately adjoins the store to the south. The running, masked man ran in front of a car which was parked headed out toward the street, and entered it from the passenger side. The car had started moving toward the exit to the street before the masked man had gotten into it, and then "it moved out rather fast." That car then turned from the parking lot to its right onto Wilcox Avenue, and was directly behind and going in the same direction as the car in which Miss Parker was then riding. At the first intersection, which was but a short distance from the parking lot, both cars stopped. Miss Parker had looked over her shoulder to ascertain the front license number on the car which the masked man had entered, and when the cars were stopped she was able to see the first three letters on the front license plate. The car in which Miss Parker was riding continued southward on Wilcox Avenue for one block and then turned right in a westerly direction. The street (Yucca) which the Parker car then traveled, within a short distance, curves in an "S-turn," and the Parker car turned in a southerly direction.

At the first intersection (North Wilcox and Franklin) from the parking lot the robber's car turned to its right, or westerly (on Franklin), and apparently, at the first intersection there-

after (Grace and Franklin) turned to its left and went southward, and finally into the "S-turn" heretofore mentioned. At that point Miss Parker saw the robber car coming from the front and to her right. The two cars came close to each other and the robber car was compelled to stop for the Parker car to avoid a collision. Miss Parker then saw the front license plate and memorized the letters and numbers which were FER 866. She also saw that there was someone in the passenger side of the robber car "but it was just a shadow then" and she could not see anyone on the driver's side.

At about 7:40 o'clock p. m., Friday, December 28, 1956, Rex Berridge, a truck driver who had known appellant for about seven years, saw the appellant, who appeared to be waiting for a bus at the corner of Sunset and Parkman. Berridge had watched the Friday-night fight on a television. Such fight, according to a representative of the broadcasting company, ended at 7:39.20 p. m. Golland asked Berridge if he, Golland, could buy him, Berridge, a drink and Berridge refused. A bus drove up headed eastward toward Los Angeles, and appellant got on it.

There was also testimony to the effect that "just somewhere after seven o'clock" the appellant was seen walking on the corner of Sunset and Le Moyne by some of his friends, namely James Godkin, Jr., Gus Rantes, Bob Lively and Milt Moore. The appellant got into a car that Rantes was driving and thereafter proceeded along various streets for seven or eight miles and then that automobile was stopped near the intersection of Sunset and Echo Park, close to the Sunset Bar, where appellant got out of the car and started toward the Sunset Bar. The appellant entered the Sunset Bar, sometime between 9 o'clock p. m. and 10 o'clock p. m., according to the testimony of the bartender who stated that he "watched the clock" in the establishment, which clock was kept about 20 minutes fast.

The Leard Plymouth automobile, license number FER 866, was returned to Mrs. Leard in Bakersfield at about 11 o'clock p. m., Friday, December 28, 1956.

Neely was arrested about 12:15 o'clock a. m., December 29, 1956, at the home of Mrs. Leard in Bakersfield.

At about 2:15 a. m., December 29, 1956, the appellant was arrested, at the Sunset Bar, for suspicion of robbery, by the Los Angeles police officers. At the time of the arrest one of the police officers engaged the appellant in a conversation and advised him that another man was involved in the crime. The

appellant was asked, while he was still at the bar, to relate what he had done that day, and Golland stated that he got up about 9 o'clock a. m., ate breakfast, and went to the library at Fifth and Flower streets, where he remained until about 5:30 o'clock p. m. He further said that he later met Rantes at Sunset and Alvarado, and that he had ridden with him in the Rantes car for about an hour, and was then let off at the bar at about 7:30 o'clock p. m.

Later, the same officer who had talked with Golland at the bar, had a second talk with him at the Hollywood Police Station in the presence of two other officers. The officer then asked Golland if he knew Charles Frederick Neely, and the appellant said at first that he did not know Neely, but when asked the same question a little later stated that he did recollect the name, but that he had not seen Neely for a long time.

Another officer had two talks with the appellant. The first was held at about 11 o'clock a. m., on Saturday, December 29, 1956, in the presence of a second officer, when the appellant was told that he was under arrest for murder. The appellant then stated that he was with John Orendorf, a bail bondsman, from about 2 o'clock a. m. until 8 a. m. on Friday, December 28, 1956; that Orendorf had driven him to the vicinity of Fifth and Hill streets, and that from there he had gone to the library where he remained until noon; that he walked home from there and then walked back to the library, where he remained until about 5 o'clock p. m.; that he then walked to the vicinity of Alvarado and Sunset where he had coffee with two or three other persons, and then, while walking along Sunset Boulevard, he was picked up by Rantes and two others in an automobile and that he stayed with them for several hours, driving around the city, and that they let him off at the Sunset Bar at which place he stayed until the time of his arrest.

The second talk between the officer and the appellant was held the next day in the presence of a shorthand reporter. At that time Golland stated that he had not seen Neely on December 27, 1956, and that the last time he saw Neely was sometime before Christmas. He also stated that he had not been in any 1950 or 1951 Plymouth automobile with Neely and that he had not participated in any robbery or murder with Neely. As to his activities on December 28, 1956, the appellant gave substantially the same account which he had initially given to the officer, except that he stated that he had taken the bus home from the library at noontime.

A police officer connected with the scientific investigation division, latent fingerprint detail, of the police department, went to Bakersfield on Sunday, December 30, 1956, and, with another officer of the same detail, examined the Leard Plymouth automobile for latent fingerprints. They found some identifiable and some unidentifiable fingerprints. One of the latent fingerprints was found inside of the door on the driver's side of the automobile on the window frame, located under the window. On January 7, 1957, the officer rolled ink fingerprints of the appellant and then compared the latent fingerprint lifted from the car door window frame, with the rolled left thumbprint of the appellant. Based on his study and comparison, the officer formed the opinion that the two fingerprints, that is, the latent one and the rolled one, were made by one and the same person, namely Norman W. Golland.

Now considering particularly the testimony of Neely, who stated in substance as follows: that he lived in Bakersfield and, on December 16th or 17th, he had driven to Los Angeles in his 1951 Ford automobile, and, while parked by a café in the Sunset-Echo Park area, met the appellant, whom he had previously known, and had a short talk with him, and then they parted; that on about December 19, 1956, he had been involved in a collision in Bakersfield with his automobile, which was then wrecked, and he had suffered a broken jaw in the accident for which he was hospitalized for a few days. He further said that on December 27, 1956, he had borrowed a 1950 or 1951 Plymouth automobile from Frances Leard, who lived in Bakersfield, and that he drove the car alone to Los Angeles on that day and arrived in the city about 4:30 o'clock p. m. His intent, on that occasion, was to commit some robberies in the city, and that he took with him a loaded .22 caliber H and L revolver. At about 5 o'clock p. m., he registered at a hotel, using the name Ronald Allard. About 8 o'clock p. m. on December 27th, while alone and seated on the driver's side of the Plymouth automobile, and while parked on Sunset Boulevard, facing west, in front of the Sunset Bar, he saw Golland walking on the sidewalk and called to him. The appellant came to the passenger side of the automobile, and he (Neely) told appellant that he was going to "pull" a robbery and asked the appellant to join him. The appellant at first demurred, but ultimately agreed. After that talk the appellant and he went to his (Neely's) room in a hotel where he was registered, and they remained there that night. During the night they tried to decide upon a good place to rob

but could not make up their minds. While they were in the room the loaded gun was shown to the appellant and he examined it. Neely also testified that he got up about 5 o'clock a. m., December 28, 1956, and went out and stole two license plates from cars in the vicinity of the hotel. He stated that he put one of the stolen license plates on the back of the Plymouth car, covering the license plate which was properly there. He said that while putting the stolen license plate on, he and the appellant had agreed that there was no need to put such a license plate on the front of the car as they would be going away from the place of the robbery and no one would "get" that license number. He said that they drove the Plymouth car "all over" Los Angeles looking for a place to rob, and that about 3 or 3:30 o'clock p. m., they went to a Sears store on Santa Monica near Western and bought two hats, one for each of them.

He further stated that about 7:10 p.m., they were driving on Cahuenga toward the "Valley" and then turned onto Wilcox and drove by the Safeway store where the murder took place. He testified that he and Golland considered and discussed it and concluded that it looked like a good place to rob. He said they then drove up a street a short distance and he put on his hat and put a mask (scarf) around his neck and drove back to the Safeway parking lot and appellant parked the car in the lot. He stated that while Golland waited in the car, he got out and walked past the store and looked in, and after walking a short distance, turned back into the store, pulling the mask up just under his eyes. There were about seven people in the store, and he announced that it was a "stick up" and proceeded to "dip into the cash register." He said he took $14. At about that time he was struck beside the head with a can which had been thrown at him. He did not see who threw the can, but as he turned the closest man to him "appeared to be the only belligerent in the place," so he fired and shot him. He noted blood running out of the man's head. He stated that he then ran to the parking lot and entered the car from the passenger side while it was moving. They then traveled down some streets and a car approached from their left and the cars nearly collided. The brakes on both cars were applied, and the car in which he, Neely, was riding spun and came to a stop beside the other car. He ducked down, and after traveling over a number of other streets, they went to the "Freeway." He further stated that the Plymouth automobile was stopped in a parking lot

off Sunset Boulevard in the Silver Lake area, and Golland got out and returned with a box of band-aids and he, Neely, placed a bandage on the side of his head where the can had struck him. He divided the money which had been taken out of the cash register by giving Golland $10, and he kept $4.00 for himself. He then left Golland at the parking lot and he, Neely, proceeded to drive the Plymouth car to Bakersfield, arriving there about 11:15 o'clock p.m. He was arrested at the home of Frances Leard about midnight. Before he was arrested he had removed the stolen license plate from the rear number bracket and had placed it in the car with the other stolen license plate.

The defense in the main was that Golland had been in Soledad prison for robbery and had been released on parole on February 14, 1956. The termination date of his parole was October 14, 1962, and conditioned, among other things, that he not associate with ex-convicts. If he did so associate with ex-convicts he was subject to arrest, and if the Adult Authority found a violation of such condition it could direct his return to prison; that he therefore lied to the officers about having been with Neely for fear that the Adult Authority might send him back to prison.

The appellant also caused testimony to be introduced by the store checker to the effect that a check was made of the cash register after Leopold was shot, and the check disclosed that for the entire day the register was $90 short.

Golland also called Ernest De Palma as a witness. De Palma had known the appellant for a few years. The witness stated that on December 28, 1956, he had left his home on Hollywood and Gramercy, and had gone by bus to Sunset and Alvarado; that at about 6:45 o'clock p.m. he saw Golland drinking coffee and having something to eat in a café on the corner of Sunset and Alvarado, and that he then spoke to Golland. He also said that there were a few others in the café, but he did not know any of them excepting the owner.

The appellant did not testify. As his counsel advised the court, "he has informed counsel that he will not take the stand."

Appellant now asserts (1) that the evidence is insufficient to sustain the conviction, and in particular that there was insufficient corroboration of the accomplice's testimony; (2) that there is a strong probability that the appellant is innocent and therefore any error, however slight, must have contributed to conviction; (3) that the court erred in sustaining

objections to questions of the witness De Palma on direct examination; (4) that the court erred in the giving of an instruction (CALJIC 30A) on consciousness of guilt; (5) that the court erred in receiving the statements of Neely made outside the presence of appellant, and in overruling the objection that the evidence was hearsay, and (6) that the court erred in denying a motion for a new trial.

Section 1111 of the Penal Code in part provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. . . ." In effect, the code section provides that the corroborating evidence, without the aid of the testimony of the accomplice, must tend to connect the defendant with the commission of the offense. In *People* v. *MacEwing,* 45 Cal.2d 218, at page 224 [288 P.2d 257], the court stated:

"The most recent decisions have in substance phrased the rule as follows: The corroborating evidence is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the witness who must be corroborated is telling the truth. (Citing cases.)"

It has also been held in substance in this state that it is not necessary that the accomplice be corroborated as to every fact to which he testifies. (*People* v. *Barclay,* 40 Cal.2d 146, 156 [252 P.2d 321]; *People* v. *Trujillo,* 32 Cal.2d 105, 111 [194 P.2d 681]; *People* v. *Henderson,* 34 Cal.2d 340, 342-343 [209 P.2d 785].) False and contradictory statements of a defendant in relation to the charge are themselves corroborative evidence. (*People* v. *Simpson,* 43 Cal.2d 553, 564 [275 P.2d 31]; *People* v. *Santo,* 43 Cal.2d 319, 327 [273 P.2d 249].)

As to proof of the elements of the crime, as contrasted with proof of the connection of the defendant with the commission thereof, such may rest upon the uncorroborated testimony of an accomplice. (*People* v. *Barclay, supra,* p. 156.)

We are of the opinion that there is ample corroborating evidence in the record to sustain the contention of the prosecution that the testimony of Neely could be used in the instant case.

The appellant seems to rely upon the rule set forth in the

cases that if the corroborative evidence raises only a suspicion of guilt, it is not sufficient under the provisions of section 1111, Penal Code. However, the evidence in this case, in our opinion, amply supports the testimony of the accomplice Neely, and strongly connects Golland with the crimes, and could well have satisfied the jury, as it apparently did, that the accomplice told the truth. It is the combined and cumulative weight of the evidence furnished by non-accomplice witnesses which supplies the test. (*People* v. *Trujillo, supra,* p. 111.)

In this case the testimony of Vera Kaloostian, the checker at the store, and the testimony of the autopsy surgeon established the facts that there was a robbery and a murder. Frances Leard testified that she lived in Bakersfield and owned a Plymouth 1951 automobile, license number FER 866; that she knew Neely, and that he had owned a 1951 Ford which was involved in a wreck which accident brought about his hospitalization, and that after December 19, 1956, he stopped driving his Ford car; that Neely never borrowed her car before December 19th, but between that date and December 27, 1956, he borrowed it two or three times for an hour or so; that on December 27, 1956, he borrowed the Plymouth car to go to Los Angeles and she did not see him again until 11 o'clock p.m. the following day. The jury could well have drawn the inference from such testimony that Neely drove Mrs. Leard's automobile to Los Angeles on only one occasion, namely on December 27, 1956.

Mr. Lloyd, the hotel clerk, testified that he worked from 5 o'clock p.m. December 27th, to 5 o'clock a.m. December 28th, and that late on the afternoon of Thursday, December 27th, Neely registered alone under the name of Ron Allard; that Neely left the hotel about 6:15 p.m. alone and returned about an hour later with Golland; that Neely looked at the telephone look while Golland stood by, and that Golland and Neely went to Neely's room and that he did not see either of them leave the hotel before 5 o'clock a.m., December 28th. Certainly the clerk's testimony tends to corroborate the accomplice's testimony that appellant spent the night before the robbery with Neely in his hotel room. It placed the appellant in Neely's company some twenty-four hours before the robbery and murder, and there is a strong inference that they were together 14 hours prior thereto, and contradicts appellant's extrajudicial statement to the officers that he had not seen Neely at the time in question.

Miss Parker testified that she was riding in an automobile being driven southward on North Wilcox, and as she passed the Safeway store she saw a masked man holding a shining object in his hand run from the store and enter a car headed out of the lot which car started moving before the masked man had gotten into it, and that the car moved toward the exit "rather fast"; she further testified that the car was a greenish-colored 1950 or 1951 model Plymouth, and that the license number on the front was FER 866. Her testimony establishes that Mrs. Leard's automobile was used in the robbery-murder, and the inference is very strong that two persons participated in the crimes; that one person went into the store, and that one person waited in the parked automobile and drove it in the get-away.

The fingerprint expert witness matched the latent fingerprint, found on the inside of the Plymouth car door on the driver's side, with the rolled fingerprint of the appellant taken about January 7, 1957. This evidence conclusively links the appellant to the Plymouth automobile which was used in the robbery-murder.

■ The appellant's extrajudicial statements to the police were contradictory in some respects. The appellant stated at one time that he did not know Neely; however, under further questioning the appellant said that the name "did ring a bell with him," but added that he had not seen Neely for a "long time." Still later he said that he had seen Neely six or ten days before. There was also an inconsistency in the appellant's statements as to his mode of travel from the library to his home. The appellant explains the contradiction about knowing Neely by stating, in effect, that he was on parole from the state penitentiary and was forbidden to associate with ex-convicts, hence he could not admit being with Neely for fear of jeopardizing his parole status. We are of the opinion that it was for the jury to determine the real reason for the contradiction, that is, whether it was his parole status or whether he was fearful of being implicated in the robbery-murder which had been committed. (*People* v. *Henderson*, *supra*, 34 Cal.2d 340, 346-347.)

The witness Orendorf testified that the appellant was with him from 4 o'clock a.m. to 9:30 o'clock a.m. on December the 27th, which was contrary to the statement made by the appellant to the officers, namely, that he was with Orendorf from 2 a.m. to 8 a.m. of December 28th.

■ The appellant told the officers he went into the Sunset Bar at about 7:30 o'clock p.m. on December 28th, and that he stayed there until arrested. Mr. Berridge, however, testified that he saw the appellant and talked with him at a bus stop near Sunset and Silver Lake or Parkman, after the fights which were shown on television and which ended at 7:39.20 p.m. Also, the bartender said the appellant entered the bar sometime between 8:40 and 9:40 o'clock p.m., by the bar clock. The appellant also stated that he had not been in a 1950-1951 Belvedere Plymouth automobile with Neely. True it is that the fact of the fingerprint in the car does not directly controvert the appellant's statement that he was not in the automobile with Neely, yet the evidence is clear that Neely took the automobile to Los Angeles on but one occasion, namely on the trip when the robbery-murder occurred. There was no evidence that the latent fingerprint was, or might have been placed in the car other than on December 27th or 28th, 1956. Under the circumstances the jury could well have inferred that the appellant left his fingerprint in the car while driving it or riding with Neely on the robbery-murder trip in question. Taken as a whole, the corroborating testimony tends to connect the appellant to the crimes committed in such a manner as could reasonably satisfy the jury and the trial judge that the accomplice Neely was telling the truth. No more is required.

■ Appellant points out that there is a conflict between the testimony of Neely and that of the witnesses who said they were with or saw Golland, and that there is a conflict between the testimony of the store checker and Neely as to the amount of money taken in the robbery. Those matters were for the jury to determine and they chose to believe Neely, which, under the circumstances, seems to us to have been perfectly proper.

The second of appellant's contentions is to the effect that the evidence submitted by the prosecution "renders it highly improbable that appellant could have been present at the commission of the crime." We need not comment on this contention more than to point out that in our opinion, the evidence taken as a whole, was such that the jury could, and did find the appellant guilty as charged. Likewise, the learned trial judge, who has had many years of experience on the criminal bench in Los Angeles County, apparently was of the same belief, as he denied the appellant's motion for a new trial.

 Coming now to the third contention, namely that the court erroneously sustained an objection to questions put to the witness De Palma on direct examination. De Palma was sworn and testified that he had previously known the appellant and that he saw Golland "about a quarter to seven" at a café at Sunset and Alvarado, drinking coffee and having something to eat, and that he (the witness) said, "hello." The question was then put: "You tell me how you place the time," and an objection thereto was sustained, the court saying, "It is a matter of cross examination." The question was then put: "Is there any particular reason that you have occasion to recall the time having been six-forty-five?" and an objection thereto was sustained.

On cross-examination the witness stated that on December 28th he was living "out on Hollywood and Gramercy" and that he had taken a bus to get to Sunset and Alvarado. He said he knew "about what time; because I left the house about 10 after six, something like that." He was not going to meet anyone, and he saw no one he knew in the café at the time, other than the owner of the café. The question was then put to the witness: "Now, how did you arrive at the time that Mr. Golland was sitting having coffee at 6:45?" The answer was: "Well, when I went down there I got the bus and I waited for about a little while, about ten minutes, something. I don't know. And I got—takes about a half hour to get down there, I guess. And I went in the cafe." Cross-examination on this point continued as follows:

"Q. So that's how you fix the time? A. Yes.

"Q. You're relating back then to an incident of catching a bus and having left home at an approximate time? A. Yes.

"Q. And as you left and you reflect back now, did you see anybody that you talked to on the streets before you saw Norman or passed the time of day or—— A. No, I'm sure of that; because I just got off the bus and I went over to the cafe.

"Q. Did you sit with Norman? A. No, I didn't.

"Q. Now, do you wear a watch? A. Yes, sir.

"Q. Did you have a watch on that night? A. Yes, sir.

"Q. Did you look at the watch when you saw Norman? A. Well, not right then, no.

"Q. In other words, you had no occasion to be looking at any time, to pinpoint time, is that right? In other words, you didn't have—you weren't trying to correlate—— A. Well, I

was sure—I was sure I looked at the clock on the wall; but I mean I was sure after the time elapsed.

"Q. In other words, did the little hand, when you saw it, was it 6:45 or was it 7:45? A. Well, when I was—I am sure it wasn't 7:45, or something like that; because I—I know what time it was when I left home.

"Q. You're relating back then to when you left home, is that right? A. Yes, sir.

"Q. Did you look at a clock before you left home? A. I looked at my wrist watch.

"Q. Did you make it a point to see what time it was when you left home that night? A. Well, yeah, just by looking at my wrist watch. I mean I remember it."

The witness also related that he thought the 28th of December was on a Friday night, and that he first knew he was going to be a witness in the present case in about April, 1957, "[a]bout a month and a half ago," and that he had talked with the appellant's brother about when he had seen the appellant.

In our opinion, the question put to the witness on direct examination was in proper form. It is set forth in Wigmore on Evidence, volume II, third edition, section 655, pages 759-761:

"The party offering a witness may desire to make plain the strength of the witness' grounds of knowledge and the reasons for trusting his belief. This is a legitimate purpose. But, in pursuing it, the witness often will naturally state circumstances which may give indirectly some unfavorable impressions against the opposite party,—as where the witness is asked, 'What made you notice the defendant's features?' and replies, 'Because he was the same man who stole my wagon last year.' Or he may relate other persons' utterances which would be inadmissible as hearsay, but for their present utility.

"Nevertheless, on the principle of Multiple Admissibility, . . . the general rule is that the witness *may* on direct examination state the particular circumstances which legitimately affected his knowledge or recollection, even though the fact would otherwise be inadmissible; the judge's instruction to the jury must be relied upon for preventing their improper use of the fact: . . ."

█ However, in the instant case, as heretofore pointed out, substantially the same question was put to the witness on cross-examination and the matter was gone into at some length. Furthermore, the witness was taken on re-direct

examination and no questions were put to the witness bearing upon the matter now before us. We are of the opinion, under the circumstances of this particular case, that the error was not prejudicial and we do not believe that a different result would have come about had the witness been permitted to answer the question on direct examination, rather than as he did answer it on cross-examination. (Cal. Const., art. VI, § 4½.)

Appellant's next contention has to do with CALJIC Instruction Number 30A[1], given by the court. Appellant insists that there was no evidence to establish that he, the defendant, "endeavored to procure false or fabricated evidence" at the trial. The court also gave CALJIC Instruction Number 8.[2]

It is conceivable that the part of the instruction Number 30A to which the appellant objects could have referred to the witness De Palma, and in appellant's closing brief he himself states: "If De Palma's testimony was accurate within a matter of minutes it was impossible for appellant to have been in the car that Miss Parker followed. The testimony of De Palma constituted a turning point in the case.

"That testimony might have been true but inaccurate, or *it might have been fabricated.* If true it might have been inaccurate. If true and accurate appellant was innocent. If true and accurate the thumb print on the car would have to be accounted for on some other hypothesis than that it was imprinted on this particular occasion." (Emphasis added.)

In any event, however, assuming that there was no evidence

---

[1] "30-A. CONSCIOUSNESS OF GUILT—FALSEHOOD

"Evidence, if any, that the [a] defendant, on one or more occasions other than from the witness stand, made false, contradictory or misleading statements concerning the charge against him which now is being tried [or that he endeavored to procure false or fabricated evidence to be produced at the trial] may be considered by the jury as a circumstance tending to prove a consciousness of guilt, but is not sufficient of itself to prove guilt. The weight to be given to such a circumstance, and the significance, if any, to be attached to it, are matters for the jury to determine."

[2] "8. ALL INSTRUCTIONS NOT NECESSARILY APPLICABLE

"The court has endeavored to give you instructions embodying all rules of law that may become necessary in guiding you to a just and lawful verdict. The applicability of some of these instructions will depend upon the conclusions you reach as to what the facts are. As to any such instruction, the fact that it has been given must not be taken as indicating an opinion of the court that the instruction will be necessary or as to what the facts are. If an instruction applies only to a state of facts which you find does not exist, you will disregard the instruction."

of any fabrication of evidence on the part of the appellant, the giving of the instruction was not harmful under the facts of this case. In *People* v. *Eggers*, 30 Cal.2d 676, at pages 687 to 688 [185 P.2d 1], the court said:

"It is error to give an instruction which, although correctly stating a principle of law, has no application to the facts of the case. (Citing cases.) To charge the jurors as to an issue not predicated upon some theory logically deducible from the evidence presents for consideration a question not properly determinable by them. However, the giving of such an instruction does not justify a reversal of the judgment unless it is affirmatively shown that the error would prejudice the rights of the defendant. In the present case, considering his admissions and the evidence tending to prove that the killing was wilful, premeditated and deliberate, the record clearly shows that the defendant suffered no prejudice. Accordingly, there is no error justifying a reversal of the judgment. (Const. art. VI, § 4½.)"

There is not the slightest affirmative showing that the giving of the instruction in question was prejudicial to the rights of the appellant. Further, on considering the entire cause and taking all of the evidence into consideration, there was no miscarriage of justice in the giving of the questioned instruction. (Cal. Const., art. VI, § 4½.)

The next contention of the appellant is that the court erred in admitting two written statements made by the accomplice Neely. Neely testified as a witness for the prosecution, as heretofore indicated, and named the appellant as an active participant in the crimes charged. On cross-examination Neely was asked, and he answered many questions concerning his motives in testifying against the appellant.[3]

The first statement was one made by Neely to the officers

---

[3] "Q. (By Mr. Graves) Mr. Neely, you pleaded guilty to first degree murder; is that correct? A. Yes.

"Q. You pleaded guilty in this courtroom? A. Yes.

"Q. At that time you had pending against you this very charge here of murder in the first degree and robbery; is that right? A. Yes.

"Q. You also had pending against you an escape charge; is that right? A. Yes.

"Q. In which you were arrested, along with Mr. Kostal and Mr. Watson; is that right? A. Yes.

"Q. Did that involve an escape by you out of the courtroom in Department 41? A. Yes.

"Q. Do I understand it is your position now, sir, you are taking the

in Bakersfield at about 1 o'clock a.m., December 29, 1956. The second statement was made by Neely to the officers in Los

stand in respect to the Court and the honesty of the oath that you are telling us the truth? A. Yes.

"Q. You have respect for the Court, do you? A. Yes, I have respect for the Court.

. . . . . . . . . .

"Q. When you pleaded in this courtroom, you understood that your sentence was to be delayed until a later time, until the determination of this case against Mr. Golland, didn't you? A. Yes.

"Q. Did you hear Mr. Busch say to his Honor at that time that he wanted to have the Court consider the testimony in this case in determining the sentence to be imposed upon you? A. I don't recall.

"Q. You don't recall that. Isn't it a fact, Mr. Neely, that you had every reason to believe, and do now believe, that you will escape the death sentence penalty and get life imprisonment punishment for the purpose of testifying here now? Just answer that one yes or no. A. I can't answer that yes or no.

"Q. Didn't you say that in the detention room in my presence, that the chances were nine to ten that you would get life imprisonment if you testified? A. I didn't say that, no.

"Q. You didn't? A. No.

"Q. Do you remember saying those very words to Mr. Ward Sullivan? A. No.

"Q. In my presence? A. I believe those were your words.

"Q. My words. Isn't it a fact that your attorney told you that the District Attorney would take a position—recommend life imprisonment if you would testify in this case? A. He said there was a good chance of it, yes.

"Q. Didn't he say to you that he had talked to the Judge in my presence in the chambers? A. Yes.

"Q. And didn't he say his Honor said at that time that he would probably be influenced in sentencing you by the testimony you gave here, but that he was not going to be bound by any deals? A. Yes.

"Q. Didn't you thereafter say, 'Well, it looks pretty good to me; the chances are nine to ten for me'? A. I didn't make any odds like that.

"Q. You believe, do you not, as you are now testifying, that you will escape the gas chamber by virtue of this testimony, don't you? A. I hope to escape the gas chamber by virtue of this testimony.

"Q. You expect to, do you not? A. Yes. .

"Q. You are relying on the statement of Mr. Sullivan, the part that Mr. Busch here, the District Attorney, said that he would recommend that you get life imprisonment for this testimony, aren't you? A. Yes.

"MR. GRAVES: We may take the recess, if the Court please, at this time.

"THE COURT: Yes; we will adjourn until tomorrow morning.

. . . . . . . . . .

"Q. Now, Mr. Neely, you told us last night that you had hopes of getting a life imprisonment sentence by virtue of your testimony here, is that correct? A. That's right.

"Q. And you also have belief, do you not, that the charge of escape with Mr. Kostal and Mr. Watson will be dismissed against you? A. Yes.

"THE COURT: When you say you have the belief, Mr. Neely, nobody has promised anything in that respect, have they?

"THE WITNESS: No, sir.

"THE COURT: In other words, it is a hope that arises in your heart?

"THE WITNESS: Yes, sir.

"Q. BY MR. GRAVES: You answered questions earlier on Wednesday if

Angeles during the morning of December 29, 1956. The appellant was not present at the making of either of the statements. No formal charges had been made against Neely at the time of either statement, and in each statement Neely named Golland as the person who had participated with him in the robbery-murder. The statements were admitted for the limited purpose of showing that his naming of Golland was not a "recently contrived statement," and not to prove the truth of the statement contained in the transcript of the conversa-.

anybody had promised you anything, and you said no; is that not so? A. Yes.

"Q. But your attorney had informed you that Mr. Busch at the time of sentencing would recommend a life imprisonment sentence for you if you testified, weren't you? A. Yes.

"Q. You were informed by Mr. Sullivan that he had talked to his Honor and his Honor said he would probably be influenced by the statements of Mr. Busch at the time of sentencing, but he was not going to be a party to any deal, weren't you? A. That was my understanding, yes.

"Q. It was on the basis of the probabilities in your mind that you decided to testify against Norman Golland; isn't that right? A. Yes.

"Q. You were afraid, were. you not, of getting the death sentence penalty in this case—— A. Yes, sir.

"Q. ——Before you testified? A. Yes.

"Q. Now, before you agreed to testify was there not a discussion in which Mr. Busch offered a robbery charge against Mr. Golland and a life first degree plea by you, in which Mr. Golland turned it down; did that influence your desire to testify?

"MR. BUSCH: I object to that, your Honor; it was never offered.

"MR. GRAVES: I will rephrase that.

"THE COURT: All right.

"Q. BY MR. GRAVES: Were you informed by me, Mr. Neely, and was Mr. Golland informed by me in your presence that they would probably take a robbery plea as to Mr. Golland if you would plead to first degree with no promise that you would escape the gas chamber; and did Mr. Golland refuse to take that plea, and were those part of the factors that influenced your desire, willingness to testify when you were assured that Mr. Busch would request a life imprisonment penalty for you?

"MR. BUSCH: I will object to that as ambiguous, your Honor.

"THE COURT: The objection is sustained. It is compound, complex, and ambiguous.

"MR. GRAVES: All right. May I change the form, if the Court please.

"THE COURT: Yes.

"Q. BY MR. GRAVES: There were some preliminary proceedings that influenced you to testify in this case; is that not so? A. That is right.

"Q. One of those preliminary proceedings was some statements about a plea by Mr. Golland to a robbery, and you to a first degree penalty; is that not so? A. Yes.

"Q. In that particular offer which was discussed, it was understood you would not have any assurance by the District Attorney that they would not ask for the death penalty, and both you and Mr. Golland refused to accept it; is that not so? A. That's true.

"Q. And it was only thereafter, when you were assured that the District Attorney would not ask for more than life at the time of your sentence, that you agreed to testify for the People against Mr. Golland in this case; is that not so? A. That's true.

tions with Neely. The jury was instructed concerning their use of the statements.[4]

Appellant insists that the contents of the statements were not consistent with the testimony of Neely, and furthermore that the circumstances do not bring the case within the ''recent fabrication'' exception to the hearsay rule, for the reason that the motive to fabricate existed at the time the statements were made.

There can be no question that counsel for the appellant, by his questions to Neely, was attempting to intimate and to show that the witness was testifying from improper motives of interest, or improper influences, or that his testimony was recently fabricated. Under the circumstances, prior consistent statements are admissible as tending to show that the witness was not controlled by such influences, or that his testimony was not recently fabricated.

In *People* v. *Kynette*, 15 Cal.2d 731, it was said (at pp. 753-754 [104 P.2d 794]): ''When a witness has been charged with improper motives of interest, or improper influences, or with recent fabrication, the law allows hearsay statements to be introduced for the purpose of showing that the same and consistent statements had been made at a time prior to the alleged fabrication or prior to the time the motive of interest existed. Such evidence is then admitted, not to prove the facts of the case, but as tending to show that the witness has not been controlled by motives of interest, and that he has not fabricated something for the purposes of the case. (*Clark* v. *Dalziel*, 3 Cal.App. 121, 124 [84 P. 429]; *People* v. *Billings*, 34 Cal.App. 549, 554 [168 P. 396]; 27 Cal.Jur. 178, § 153.) The trial court both at the time of its admission and at the close of the trial admonished the jury, as required by the authorities, that this particular evidence was limited to the credibility of Sakalis.''

Also, in *People* v. *Walsh*, 47 Cal.2d 36, it was set forth (at pp. 42-43 [301 P.2d 247]): ''It may be assumed that the witnesses' bias and prejudice against the defendants originated at the time of or prior to the time they were forced to pay the bribes. But in addition to showing such bias and

[4] ''In this trial there were times when certain evidence was admitted relative to conversations and statements made by the witness Charles Neely to the Bakersfield and Los Angeles Police Officers. These statements and conversations were offered for the limited purpose of showing prior consistent statements of the witness and not for the truth of any of the matters contained in the statements and conversations.''

prejudice the cross-examination pursued by the defense was designed to create inferences of fabrication which originated after the time of the bribes and after the making of the writings and statements claimed to have been improperly admitted for the purpose of rehabilitation. . . .

"With reference to the questioned rulings and instructions it is to be noted that it is not necessary that the party desiring to impeach should expressly state that he seeks to prove a fabrication of recent date. It is sufficient if the record indicates a purpose to prove a recent fabrication. (Citing cases.) In the present case inferences of fabrication since the alleged bribes could be fairly drawn by the jurors in addition to those which would tend merely to impeach the witnesses' general reputations or otherwise cast doubt upon their testimony. We find no error in admitting evidence of prior consistent statements for the limited purpose of refuting inferences of subsequent fabrication and to show a prior state of mind consistent with that shown by the witnesses when testifying. However, if there was any error in ruling on the admissibility of the evidence a review of the record discloses no miscarriage of justice resulting therefrom."

In the present case the jury could properly infer from the questions asked and the testimony given during the cross-examination of Neely that owing to the promises of the district attorney, the motive to fabricate did arise after the making of the two statements.

We have carefully read each of the statements in question and we have come to the conclusion that they were, almost in their entirety, consistent with the testimony of Neely on the witness stand. In other words, the statements were in substantial accord with his testimony. (See *People* v. *Billings,* 34 Cal.App. 549, 554 [168 P. 396].) Appellant argues that in one of the statements Neely admitted the robbery, but denied the shooting, and attempted to make it appear that Golland had done the killing. The statement made in Bakersfield shows that Neely stated that he did the actual shooting.[5]

---

[5] " . . . Will you, in your own words, describe the details of the aforementioned crime to the best of your knowledge and recollection?

" A. There was no advance plan to rob the place. We were looking for something that looked easy and that might have some money in there that would give us each two or three hundred a piece and we drove around all day. We drove around 12 hours—13 hours—from 6:30 in the morning till about 7:15 when this occurred, and we drove up Cahuenga at my partner's suggestion and spotted this Safeway Store and there appeared to be only the woman clerk and two or three other women in the place when we went past, and made a 'U' turn on Cahuenga and passed the

The statement made in Los Angeles on the 29th of December also shows that Neely said that he did the actual shooting.[6]

Appellant's last contention is that the court erred in not granting his motion for a new trial. Under this heading he

store again and then went up in the hills there—I don't know what street it was—first street south of the store. We went up that street and I put on a mask and took a pistol out from under the seat. We went back to that place, parked in the parking lot. I walked past the store. I didn't pay too much attention—I just—I was looking for people outside the place at the time. There were several people there so I walked past the store and when the store had cleared to my satisfaction I walked into the store, pulling out my mask at the same time. There were a couple of people around the cash register and I motioned them away with my gun and directed my attention to the cashier. After ordering her to open the cash register I started to reach for the money and was nearly felled by a blow on the head and I realized that someone had thrown something. I turned around and this appeared to be the logical fellow or something. I was groggy and the gun went off. I saw blood spurt; I dropped everything and fled the scene. And there you have it. We drove, my partner drove down the Freeway and I was crouched in the front seat—on the floor boards—and when he had satisfied himself that we were not being followed he parked and I changed clothes. He procured some band aids for me and I put one on my head. I gave him $10.00 and he said he was going to get a pad for the night and we parted and I drove forthwith to Bakersfield . . . stopping twice.

. . . . . . . . .

"Q. Charles, what's the name of your partner? A. Norman Golland.

. . . . . . . . .

"How much money did you realize on the robbery of this Safeway Store? A I don't know. I gave Golland $10 and I had $4.00—I guess we got $14.

"Q. In other words you had $14.00? A. Possibly $14.00."

[6]"Q. You parked the car in the Safeway store, did he knew you were going to hold the store up? A. Yes.

. . . . . . . . .

"Q. Did you two have some conversation in the car after the robbery regarding the shooting? A. Yes, we had some conversation.

"Q. Will you tell us what that was? A. It was sort of hysterical. I was really scared, when we ran out of the place, 'I said, 'let's go, I just killed a man.' I didn't know what to do.

"Q. What did he say to that? A. I don't know, don't recall, he was driving so erratically.

"Q. At the time you went into the Safeway Store with the intent to rob it, you had a 22 cal. H & R, was it loaded? A. Yes.

"Q. Was it loaded with live shells? A. Yes.

"Q. Do you recall how many shells were in the revolver at the time? A. Nine.

"Q. How many shots did you fire in the market? A. One.

"Q. Eight live shells, cartridges left which were found in the gun by Bakersfield Police, were they the same cartridges in the gun at the time the robbery was committed? A. Yes.

"Q. And the empty shell, the expended shell was that the shell that was fired in the commission of the robbery? A. Yes.

"Q. Did Golland know at that the time you went into to commit the robbery that the revolver was loaded? A. Yes.

. . . . . . . . .

"Q. I would like to ask you about the laceration near the corner

reasserts all that has heretofore been contended. The trial judge in this cause had the opportunity to see and to listen to the witnesses, and he apparently was well satisfied with the sufficiency of the evidence and with the verdicts. He obviously entertained no serious doubts as to the credibility of the witnesses for the prosecution. It was appropriately said in *People* v. *Green*, 13 Cal.2d 37, at page 42 [87 P.2d 821] : "It is the function of the jury in the first instance and of the trial court after verdict to determine what facts are established by the evidence and before the verdict of the jury which has been approved by the trial court may be set aside on appeal for insufficiency of the evidence, it must be made to appear that there is no substantial evidence to support the conclusion of the jury and the trial court. (Citing cases.)

A conviction may not be set aside because the evidence is susceptible of two reasonable inferences, one looking to the guilt of the defendant and the other to his innocence. (Citing cases.) ''

The appellant did not take the witness stand. This he had a perfect right to do, however, by so omitting to testify he left unexplained many important matters which were, in our opinion, to his detriment.

---

of your left eye? How did you get that? A. I was struck with a can of what I am told was chili con carne.

"Q. Before or after you fired this shot? A. Before, immediately before.

"Q. At the time you fired the shot did you fire it directly at or toward any individual? A. I fired it where I thought the can was thrown from? I saw that I hit this man. I saw blood on his head.

"Q. Didn't you see him fall? A. I was in a hurry, nervous, and dropped everything and ran out.

"Q. I am going to show you a H & R 22 cal. rev. ser. R 42996 and ask you if you have ever seen this revolver before? A. I am not familiar with the number but I believe this is the one.

. . . . . . . . . . .

"Q. I would like to ask you a couple more questions about the robber*ie* at 1921 Wilcox Ave., as you pulled in with the automobile preparatory to committing the robbery, where was the automobile parked. A. In the store's parking lot.

"Q. Next to the building? A. Next to the building, facing outward.

"Q. How far back from the street? A. Fifteen or twenty yards from the street.

"Q. After the robber*i* and shooting inside the market, what did you do? A. Ran to the car and left in a very erratic manner.

"Q. At the time you fired the shot in the market, and you saw you hit someone, did you stop to see if you had hurt that person seriously or did you leave the scene? A. I was too frightened, I left immediately.

"Q. Did you tell Golland? A. Yes.

"Q. Do you recall what he said to that statement? A. No.

"Q. Did he seem frightened that you had shot someone? A. Yes, he was—his driving indicated he was frightened."

In 1934, the Constitution of the state of California was amended (art. I, § 13) to provide among other things that the defendant's failure to take the witness stand in a criminal case and to explain certain evidence which had been introduced in the cause may be considered by the jury, and the failure to deny or explain may be considered by the jury as tending to indicate the truth of such evidence and as indicating and making permissible the drawing of unfavorable inferences against the defendant as more probably correct than inferences favorable to him. (See McBaine, Calif. Evid. Manual, 1953 Pocket Part, p. 46.)

*People* v. *Adamson,* 27 Cal.2d 478 [165 P.2d 3], was a murder case which resulted in the death penalty. The defendant did not testify in his own behalf. The prosecutor commented upon such failure. The evidence in the case included fingerprints of the defendant at the scene of the murder, some stocking tops and some testimony with reference to a diamond ring which was missing when the deceased's apartment was searched. ▆▆▆ The court, in sustaining the conviction, said among other things (at p. 495), "Fingerprints are the strongest evidence of identity of a person and under the circumstances of the present case they were alone sufficient to identify the defendant as the criminal. (*People* v. *Ramirez,* 113 Cal. App. 204 [298 P. 60]. . . .)" ▆▆▆ The court in the Adamson case also stated, at pages 488-494:

"It is clear from the terms of the constitutional provision that the consideration and comment authorized relates, not to the defendant's failure to take the stand, but to 'his failure to explain or deny by his testimony any evidence or facts in the case against him' whether he testifies or not. The constitutional provision thus makes applicable to criminal cases in which the defendant does not testify, the established rule that the failure to produce evidence that is within the power of a party to produce does not affect in some indefinite manner the ultimate issues raised by the pleadings, but relates specifically to the unproduced evidence in question by indicating that this evidence would be adverse. (Citing cases and authorities.) 'All evidence is to be weighed according to the proof which it was in the power of one side to have produced and in the power of the other to contradict.' (Mansfield, C. J. in *Blatch* v. *Archer,* 1 Cowp. 63, 65; see 2 Wigmore, *supra,* 162 et seq., and cases there cited.) The Code of Civil Procedure codifies this rule by providing that the jury is to be instructed by the court on all proper occasions: '6. That

evidence is to be estimated not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict'; (Code Civ. Proc., § 2061, subd. 6), and that it is to be presumed 'That evidence wilfully suppressed would be adverse if produced' (*Ibid.* § 1963, subd. 5). The basis in common experience for this rule as applied to criminal cases has been set forth in *State* v. *Grebe,* 17 Kan. 458: 'The instinct of self-preservation impels one in peril of the penitentiary to produce whatever testimony he may have to deliver him from such peril. Every man will do what he can to shield himself from the disgrace of a conviction of crime, and the burden of punishment. We all know this. We all expect it. Whenever therefore a fact is shown which tends to prove crime upon a defendant, and any explanation of such fact is in the nature of the case peculiarly within his knowledge and reach, a failure to offer an explanation must tend to create a belief that none exists.' Therefore the failure of the defendant to deny or explain evidence presented against him, when it is in his power to do so, may be considered by the jury as tending to indicate the truth of such evidence, and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable. Respondent cites *People* v. *Dukes,* 16 Cal.App.2d 105, 109-110 [60 P.2d 197]; *People* v. *Pianezzi,* 42 Cal.App.2d 265, 267-269 [108 P.2d 732] and *People* v. *Dozier,* 35 Cal.App.2d 49, 59-60 [94 P.2d 598], as holding that failure to testify directly affects the ultimate issue of guilt by raising an 'inference or presumption of guilt.' The instruction refused in the Dukes case was in part to the effect that the members of the jury were 'not to consider or permit [themselves] in anywise to be influenced by the fact that the defendant has not seen fit to offer himself as a witness before you.' A similar instruction was refused in the Pianezzi case. The instruction refused in the Dozier case provided that failure to deny or explain testimony 'should not create a prejudice or unfavorable inference in the minds of the jury; no inference can be drawn against the defendant from his failure to testify.' In these cases the court was clearly correct in holding that the instruction would destroy the effect of the 1934 amendment.

██ "The failure of the accused to testify becomes significant because of the presence of evidence that he might 'explain

or . . . deny by his testimony' (art. I, § 13, Cal. Const.), for it may be inferred that if he had an explanation he would have given it, or that if the evidence were false he would have denied it. (*State* v. *Grebe, supra*; *Mooney* v. *Davis, supra*, 193 [75 Mich. 188 (42 N.W. 802, 13 Am.St.Rep. 425)]; see Code Civ. Proc., §§ 1963 subds. 5, 6, 2061 subds. 6, 7.) No such inference may be drawn, however, if it appears from the evidence that defendant has no knowledge of the facts with respect to which evidence has been admitted against him, for it is not within his 'power' (Code Civ. Proc., § 2061 subd. 6) to explain or deny such evidence. (Ibid., § 1963 subd. 5; *Parker* v. *State*, 61 N.J.L. 308 [39 A. 651]; *Caminetti* v. *United States*, 242 U.S. 470, 494, 495 [37 S.Ct. 192, 61 L.Ed. 442]; *Blatch* v. *Archer, supra*; *R.* v. *Burdett*, 4 B. & Ald. 122; see *People* v. *Albertson*, 23 Cal.2d 550, 585 [145 P.2d 7].)

. . . . . . . . .

"Defendant contends that the rational connection between a fact proved and the fact presumed required by the due process clause of the Fourteenth Amendment (citing cases) does not exist between the failure to deny or explain incriminating evidence and the inference of the credibility and unfavorable tenor thereof that these provisions permit the jury to draw. Defendant argues that reasons other than lack of power to explain favorably to himself or to deny such evidence, for example fear of disclosure to the jury of prior crimes through impeachment (Code Civ. Proc., § 2051; see 3 Wigmore, *supra*, 538; *ibid.* 380) or fear of creating a bad impression by being a 'poor witness,' may prompt a defendant not to take the stand. In view of the even poorer impression normally created by not taking the stand (citing case and authorities), fear of creating a bad impression because of being a 'poor witness' is not an impressive explanation of a defendant's silence. (Citing authorities.) It is true that defendants convicted of prior crimes often do not take the stand because of fear that upon cross-examination their criminal record will be given to the jury. (Citing authorities.) Clearly, however, the inference authorized need not be the only plausible one that can be drawn from the proved fact, to be rational under the due process clause. The inference is rational if the proved fact is a warning signal according to the teachings of experience. (Citing cases). It is common experience that the failure to explain or deny adverse evi-

.dence that a defendant may reasonably be expected to explain or deny tends to show the credibility of such evidence and renders more probable the unfavorable tenor thereof. (Citing cases and authorities.)

"There has been much criticism of the present state of the law, which places a defendant who has been convicted of prior crimes in the dilemma of having to choose between not taking the stand to explain or deny the evidence against him thereby risking unfavorable inferences, and taking the stand and having his prior crimes disclosed to the jury on cross-examination. (Citing authorities.) In the present case defendant admitted two prior felony convictions for which he served terms of imprisonment in the Missouri state prison. The fact of the commission of these crimes was not offered or introduced into evidence and would have been inadmissible under the general rule with respect to prior crimes. (*People* v. *Albertson*, 23 Cal.2d 550, 576 [145 P.2d 7], and authorities there cited.) Had defendant taken the stand, however, the commission of these crimes could have been revealed to the jury on cross-examination to impeach his testimony. (Citing case and authorities.) Since fear of this result is a plausible explanation of his failure to take the stand to deny or explain evidence against him (citing authorities), the inference of the credibility and unfavorable tenor of such evidence that arises from this failure is definitely weakened by this rule of impeachment. This weakness, however, could not be revealed to the jury by counsel or court without prejudicing the defendant through the revelation of past crimes. Court and prosecutor are left no alternative but to comment on defendant's failure to deny or explain evidence against him as though the sole reason for his silence was that he had no favorable explanation. Any change in the law in this respect, however, must be made by the Legislature."

 In the present case the appellant obviously did not refuse to take the witness stand for fear that it might be disclosed that he was an ex-convict, for he himself affirmatively caused it to be brought out in his defense that he was an ex-convict, and was at the time on parole. He, and he alone, could have explained how his fingerprint got onto the framework of the window on the driver's side of the Plymouth car, and he chose not to do so, and therefore the jury could, and apparently did draw the inference that he, Golland, was in the Plymouth car at the time of the robbery-murder as a participant, and therefore properly convicted him.

Any error committed at the trial, was, in our opinion, not prejudicial to the appellant and there was no miscarriage of justice.

The attempted appeal from the ''sentences'' is dismissed.

The judgments and order are, and each is, affirmed.

White, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied September 24, 1958, and appellant's petition for a hearing by the Supreme Court was denied October 28, 1958.