THE STATE OF OHIO, APPELLEE, *v.* WILSON, APPELLANT.

(No. 1116—Decided February 16, 1971.)

*Mr. William D. Kennedy,* prosecuting attorney, for appellee.

*Messrs. Moore & Wolfe* and *Mr. Dale Christner,* for appellant.

GRAY, P. J.   This cause is in this court on appeal from a judgment of the Court of Common Pleas of Lawrence County finding defendant guilty of murder in the first degree with a recommendation of mercy.   The defendant was accorded, at his request, a trial before a three-judge court.

Defendant feeling aggrieved by this result of his trial filed his notice of appeal and assigned the following errors.

"ASSIGNMENT OF ERROR No. 1.   The court erred in overruling the defendant's motion to suppress statements,

both oral and written, made by the defendant to investigating officers.

"ASSIGNMENT OF ERROR No. 2. The court erred in overruling the defendant's motion to suppress testimony and reports of Dr. Sheldon Rogers.

"ASSIGNMENT OF ERROR No. 3. The court erred in admitting the deposition of Ida Wilson over the objection of the defendant.

"ASSIGNMENT OF ERROR No. 4. The court erred in admitting the deposition of Thomas Wagner over the objection of the defendant.

"ASSIGNMENT OF ERROR No. 5. The court erred in not granting defendant's motion for a new trial.

"ASSIGNMENT OF ERROR No. 6. The finding of the court that the defendant was not insane at the time of the alleged offense was not sustained by sufficient evidence."

The facts as developed in the record are as follows. The victim, Cyril Eugene Wilson, was killed by his brother Donald D. Wilson on August 5, 1964 in Lawrence County.

The deceased and his wife, Ida, lived in Ironton. Defendant lived with them. Ida claims that defendant had given his brother some "dope" to which action she objected. There was other evidence that Ida and defendant had had some misunderstandings. Initially Ida left home and later the victim ordered defendant to leave which precipitated the thought in the mind of defendant to kill his brother.

The following evidence was adduced.

"Q. Relate the conversation then?

"A. Don asked me for a Blatz beer and I served him. He said, Ida, he done me dirty. I said who and he said Gene. I said what did he do and he said that he run him off."

"Q. Would you tell the court, what, if anything, Mr. Wilson said to you. Don Wilson I mean?

"A. Don told me, he said I have a gun in my pocket and carry nine shells. It is loaded all the way around and I have extra slugs in my pocket. I will meet him one time on that road some day. He said that nobody runs me off and gets by with it."

Ida saw her husband later that night in the cafe where she worked. She told him what defendant had said. In the cafe, defendant and Ida were facing each other, sitting in adjoining booths. The defendant appeared to be acting normally at that time.

The deceased picked up his wife at the closing hour of 2:30 a. m. on August 5, 1964 and took her "straight" home. Defendant had drunk at least three beers in Kellys Cafe (where Ida worked).

While Ida was on the top step and her husband was on the bottom step of the flight of stairs leading to the front porch of their home, Ida heard a "crack" and she asked herself the following question: "who is putting off fire crackers at this time of morning?" Her husband fell stating: "Son of a bitch, baby, he shot me."

Ida next heard the rustle of leaves in a tree standing in the yard nearby. She looked. She saw defendant climbing down the tree. Defendant jumped down to the ground. He started shooting again.

Deceased was shot twice, both times through the abdomen. One of the shots penetrated the large blood vessel in the abdomen, the aorta, and caused death by internal bleeding. Death occured as a result of this shot in 15 or 20 minutes.

Defendant, on the 4th day of August, 1964, around five p. m., had borrowed a 9 shot .22 caliber pistol. The owner of the weapon, Thomas Coleman, testified regarding this event as follows:

"Q. Mr. Coleman, going back to the time that Mr. Wilson got the gun from you, what if anything did he say to you as to why he wanted the gun?

"A. Well he said he wanted the gun for target practice and that was the reason he wanted to use it, in a joking like way he said in case I shoot somebody with it, tell them I bought the gun off you for $20.00."

The police were called. Captain Akers and Officer Dennin responded. Defendant was sighted behind the flood wall near Maple Avenue in Ironton. Defendant began firing his pistol at Akers from about 20-25 yards away. Akers alerted Dennin by radio of the situation. Akers re-

turned the fire. One of Aker's shots came close to defendant. Defendant threw his gun down. Akers checked defendant to see if he were injured. He was not.

Defendant was taken to the police station by Akers and Dennin where he was booked and questioned. Defendant was advised of all of his rights as prescribed in *Miranda* v. *Arizona*, 384 U. S. 436, except the one that required the officers arresting an accused to inform him that if he could not afford an attorney one would be furnished him at state expense.

When defendant was told that Captain Akers would call an attorney defendant said: "I don't need a damm [*sic*] attorney, I done it." Defendant appeared to be calm, cool, collected and cooperative. Defendant said he knew that he had a right not to say anything but he wanted to talk. Defendant was very relaxed, very talkative and had a very friendly attitude toward the arresting officers. Defendant said: "I done it, I will tell you all about it." He made a full confession and signed it.

Defendant then filed a motion to suppress his confession and the statements that preceded such confession. The motion was overruled. This ruling becomes the basis for the first assignment of error which we will now consider.

From defendant's brief, it appears that the sole basis for this assignment of error is that he was not advised that if he could not afford counsel one would be appointed to represent him.

Let us look at the record. Before *any* questioning started and while defendant was being warned in accordance with his constitutional rights as outlined in *Miranda,* he said: "I don't need a damm [*sic*] lawyer, I done it." Let us analyze this statement. We think that he waived his rights to an attorney and did so intelligently and knowingly. When he said, "I done it," he made a *voluntary* statement not proscribed by the *Miranda* rules. He reinforced the waiver by adding the words "I done it," and he reinforced the words "I done it" by the words "I don't need a damm [*sic*] lawyer." The Supreme Court of Ohio has passed upon this point in *State* v. *Perry,* 14 Ohio St.

2d 256. Justice O'Neill, now Chief Justice, speaking for the court said, at page 261:

"The proposition that volunteered statements do not come within the protection of the Fifth and Sixth Amendments to the United States Constitution has been recognized and stated in varying factual contexts both before and after the decision in *Miranda*."

Before petitioner made any incriminating statements, he received all but one of the *Miranda* warnings. This is a circumstance quite relevant to a finding of voluntariness.

The question arises, should defendant be allowed to close the mouth of the policeman who was giving him the *Miranda* warnings by means of a "blurt"? We believe the answer is in the negative.

At the hearing on the motion to suppress evidence, it is noted that during the cross-examination of Captain Akers, as soon as the defense attorney developed the fact that the Captain had not advised defendant of his right to appointed counsel, he stopped his cross-examination. It takes more than the development of this fact to open the penitentiary doors for this or any other defendant. In this instance, defendant overlooked the fact that he had made a voluntary statement that took his case outside the limits imposed by *Miranda*. He is now and has been throughout his various court appearances represented by counsel.

The *Miranda* decision was not intended to hamper the traditional function of police officers in investigating crime, and that decision contained no requirement that a person who volunteers a confession must be prevented from doing so. Neither does it prevent an officer from testifying to the contents of a confession he has heard under these circumstances.

The incriminating admissions to Captain Akers had not been made in response to any question, suggestion, or inquiry; and his statements had been devoid of the impulsion of coercive police conduct, interrogation, or atmosphere.

The gist of the complaint of defendant in his second assignment of error is that he was taken to Portsmouth for

a psychiatric examination from Ironton without his counsel being notified contrary to an agreement between counsel for the state and defense counsel. We have examined the record and cannot find an instance where Dr. Rodgers, the psychiatrist, revealed any facts concerning the commission of the alleged crime. We know of no authority and none has been cited whereby a defendant is entitled to choose the psychiatrist that will examine him. A defendant in a criminal case does not have the right to control the trial court in the use of its discretion to choose the means under law by which an accused will be tried. Such defendant cannot successfully insist on some procedure he thinks would give him a better chance of minimizing the punishment he might receive for the alleged commission of the offense charged in the indictment.

It must be remembered that defendant telegraphed his intention to commit murder to Ida Wilson and Thomas Coleman and that Ida Wilson was an eye witness to the murder. The testimony of Dr. Rodgers pertained solely to the medical and mental condition of defendant. The record shows that counsel for the prosecution attempted to get in touch with counsel for the defense beforehand but was unable to do so. In any event, the psychiatric examination was going to be given to the defendant and not to his counsel. Defendant was afforded free and full cross-examination of this witness and he availed himself of that right. He has not shown that his case has been prejudiced.

This examination of defendant in the absence of his attorney was a mere preparatory step in the gathering of the prosecution's evidence and was not different from various other preparatory steps, such as the systemized or scientific analyzing of the accused's fingerprints, blood, clothing, hair, and the like. The denial of the right to have counsel present at such analyses does not violate the Sixth Amendment, since they were not critical stages—inasmuch as there was a minimal risk that counsel's absence at such stages might derogate from a defendant's right to a fair trial.

Defendant does not contend that his lawyers should have been with him for the duration of his stay at Lima State Hospital when he was tested and examined. The result of these examinations were favorable to his position. The tests given at the Portsmouth Receiving Hospital were unfavorable. He stoutly maintains that prejudicial error intervened when his attorneys were not notified of the time and place of the examination at Portsmouth. Defendant cannot claim the benefits and eschew the liabilities of the consequences flowing from the entering of his plea of not guilty by reason of insanity. This plea is a knife that cuts both ways.

The third assignment of error is based upon the fact that the deposition of Ida Wilson was not enclosed in a sealed envelope as required by R. C. 2319.19. Defendant has not shown wherein he has been prejudiced. He is not claiming that there is any fraud, deceit or mistake in the deposition as filed. Defendant must show that there was a deviation from the requirements of the law pertaining to his case and that he was prejudiced thereby. Since such is the fact, this assignment of error is without merit.

In the fourth assignment of error, defendant complains that the person who administered the derma-nitrate tests gave defendant no warnings beforehand. We have examined the contents of the deposition of Mr. Wagner. Such a test is not forbidden by either the provisions of the United States Constitution, or the Constitution of the state of Ohio. We believe that there is no prejudicial error here. In the third paragraph of the syllabus of *United States* v. *Wade,* 388 U. S. 218, 87 S. Ct. 1926, it is stated:

"Compulsion to submit to fingerprinting, photography, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make particular gesture does not become testimonial within scope of privilege against self-incrimination because required of accused in pre-trial lineup. U. S. C. A. Const. Amend. 5."

We are of the opinion that the same principles apply

to the introduction of evidence concerning the results of derma-nitrate tests.

Cf., *Holt* v. *United States*, 218 U. S. 245, 31 S. Ct. 2, 54 L. Ed. 1021.

Where a defendant is accused of committing murder in the first degree and is not guilty thereof, the taking of a reasonably reliable chemical test for the presence of nitrates upon his hands should establish that he did not recently fire a gun. On the other hand, if he did fire a gun, the taking of such a test would probably establish this fact. Thus, if he did not fire the gun, such a test will provide evidence for him; but, if he did fire the gun, the test will provide evidence against him. It is reasonable to infer that counsel's strenuous objection to the introduction into evidence of the results of this test indicates a fear of the results. And, well it might be, as there was an eye witness to the murder and the pistol recovered from defendant was identified by ballistic tests as the one which fired the fatal shots.

According to the person who administered the derma-nitrate test, defendant willingly took the tests and was not given all of the *Miranda* warnings.

We now address ourselves to the sixth assignment of error.

On a plea of not guilty by reason of insanity, defendant was sent to Lima State Hospital for examination for not more than 60 days on November 27, 1964, and released to Lawrence County authorities January 8, 1965 with a diagnosis of "paranoid state." Defendant was recommitted to Lima State Hospital upon a finding of the Common Pleas Court that he was not then sane. He remained at Lima State Hospital until March 3, 1969 when he was released, having been restored to reason. Psychological testing, on February 19, 1969, revealed that the patient was not psychotic (I. Q.—107).

Dr. Reshetylo of the Lima State Hospital Staff testified that in his opinion defendant was legally insane on August 5, 1964. Dr. Rodgers of Portsmouth Receiving Hospital testified that in his opinion defendant was sane on

that date. Both doctors have imposing credentials. Both of them backed their opinions with facts from their examination. Both arrived at diametrically opposed positions with regard to defendant's mental condition on August 5, 1964.

We have read and reread the record concerning the testimony of these two doctors. The Supreme Court of Ohio states the law of Ohio as follows:

"A person accused of a crime who knows and recognizes the difference between right and wrong in respect to the crime with which he is charged and has ability to choose the right and abjure the wrong is legally sane." (Paragraph 15 of the syllabus of *State* v. *Frohner*, 150 Ohio St. 53.)

*Cf., Dusky* v. *U. S.*, 271 F. 2d 385, *rev'd on other grounds* 362 U. S. 402, and *State* v. *Keaton*, 9 Ohio App. 2d 139, *cert. denied*, 390 U. S. 971. In applying the law as laid down in these two cases, we are of the opinion that no prejudicial error intervened here.

On appeal on questions of law, this court is not permitted to substitute its judgment on the facts for the judgment of the trial court. *Trickey* v. *Trickey*, 158 Ohio St. 9, 14. Furthermore, this court is bound by the findings of facts of the trial court if those findings are supported by any substantial evidence. *In re Tilton*, 161 Ohio St. 571, 577 and 578.

We hold that the trial court's findings in this respect are amply supported by substantial evidence.

Under the facts of this case and in relation to our opinions expressed herein, defendant has not shown any right to a new trial.

We have examined all of the errors assigned and argued and find none prejudicial. Therefore, the judgment of the trial court is affirmed.

*Judgment affirmed.*

ABELE and STEPHENSON, JJ., concur.