298 A.2d 124.

STATE *vs.* FREDERICK J. OUIMETTE AND RONALD H. SWEET, JR.

DECEMBER 18, 1972.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

ROBERTS, C. J. This is an indictment charging that on October 21, 1969, Frederick J. Ouimette and Ronald H. Sweet, Jr., hereinafter referred to as Ouimette and Sweet, murdered one Michael Greene, hereinafter referred to as Greene. The defendants were tried before a justice of the Superior Court sitting with a jury during June, 1970. The jury returned a verdict of guilty in the case of each defendant. Subsequently, a motion for a new trial filed by each defendant was denied, and each defendant was sentenced to imprisonment for life. Each is now prosecuting a bill of exceptions in this court.

It is not disputed that Greene was shot to death at about 8 o'clock on the evening of October 21, 1969, while standing between two cars parked parallel to one another on Althea Street in the city of Providence. The evidence discloses that Greene and Donna M. St. Rock, hereinafter referred to as St. Rock, were friendly and often went out together. On that evening St. Rock and her cousin, Christine Choiniere, hereinafter referred to as Choiniere, had driven Greene from his home on Althea Street in Providence, to a gas station located on Broadway in that city. Choiniere was driving the car, St. Rock was riding next to her in the front seat, and Greene was riding beside St. Rock. At the gas station, according to the testimony of Choiniere, Greene had gotten out of her car to talk for a couple of minutes to the occupants of a dark blue car that had come into the gas station immediately after they had driven in.

After Greene returned to Choiniere's car, they left the gas station to return to Althea Street. While driving along Althea Street, Choiniere realized that the car she had seen at the gas station was following them. Apparently at the suggestion of Greene, she parked her car on the right-hand

side of Althea Street at the curb. The car following then came alongside of Choiniere's car and parked about two or three feet to the left of her car. Greene alighted from Choiniere's car and, leaning on the door of the other car, began talking to the occupants while she and her cousin, St. Rock, remained in her car. According to her testimony, she suddenly heard several shots, felt glass from the windshield striking her in the face, and, upon alighting from her car, found Greene lying on his back in the street. His body was parallel to her car, and his feet about opposite the door of the driver's station.

According to the further testimony of Choiniere, she had had an opportunity to see the face of the passenger in the other car when it pulled alongside. After a few moments she was able to observe the driver's face. Thereafter, she identified Ouimette as the driver and Sweet as the passenger in the car that parked alongside hers. She had identified the two defendants, first, from photographs in the possession of the police and, secondly, during the course of two separate lineups at the state prison.

## I

At the trial of these defendants Choiniere testified, but St. Rock could not be located. The state contended she was unavailable to testify. The court, however, permitted the prosecution to read into evidence two transcripts of the testimony that St. Rock had given at the bail hearing of each defendant. In support of his motion to put the contents of these transcripts into evidence, the prosecutor testified that on May 14, 1970, he had conferred with St. Rock in his office for the purpose of preparing for trial. He conceded that at that time he had informed her that she could finish out the week as an employee of a Boston restaurant but that she should be certain to return to Rhode Island in time for the expected start of the trial on May 18. He testified that he instructed her to call him on Mon-

day, May 18. She did not call on May 18, but did so on Friday, May 22, to inquire when she should come to court. However, she would not tell him where she was at that time. She did tell the prosecutor that she would be in his office the next afternoon, which would be a Saturday. On that day he waited in his office until well after noon, but she did not appear.

Considerable evidence was introduced concerning the reasons for the unavailability of St. Rock and the efforts of the prosecutor and the Providence police to locate her. On May 26 the prosecutor directed the Providence police to take St. Rock into custody. Vincent J. O'Connell, a lieutenant-detective in the Providence Police Department, testified in considerable detail as to his efforts and those of the Providence police to locate St. Rock both within and without the state. O'Connell testified that he knew her address and telephone number in Boston; he spoke to her early in May, directing her to appear to testify on May 14 at the trial. He went on to testify at some length concerning his activities to ascertain the whereabouts of St. Rock.[1] On this evidence and the testimony of St. Rock's mother,

---

[1] Lieutenant O'Connell testified specifically at page 665 of the transcript:

"21 Q And as a result you were still in control of the investigation?
A Yes.
"22 Q And will you tell this Court what you did through your direction and personally to locate Donna St. Rock?
A I first contacted the Warwick, Rhode Island police to put out a missing person report on her because she resided in Warwick. I then sent out a nation-wide teletype stating that she was missing and giving her description and so forth. I then sent photographs and description to all local departments in the State of Rhode Island and in the nearby New England area. I then went to Boston, Massachusetts where I traced her to a house on Back Bay Street in Boston. She had been there and left. I traced her to several night clubs in the area of, I think, the Back Bay section. I traced her from there to the State of Maryland, too, and Washington, D. C., and I traced her to Ocean City, Maryland. I traced her back to

the trial justice found that the state had used due diligence in attempting to locate the witness and admitted her testimony recorded at each of the prior bail hearings into evidence.

In this court defendants argue vigorously that the action of the trial court in admitting the prior testimony of St. Rock constituted reversible error. They contend that the state failed to show that it exercised due diligence in its efforts to produce the witness for in-court testimony and thus failed to establish the essential predicate as to the unavailability of the witness that under the prevailing rule warrants the admission of prior testimony into evidence. They argue further that the prior testimony of St. Rock was inadmissible at the trial because defendants were denied their right to cross-examine the witness at the bail hearings in violation of the right to confrontation guaranteed them by the sixth amendment.

It is a well-settled exception to the hearsay rule that the testimony of a witness given at a prior hearing or former trial is admissible at a later trial when the witness is unavailable. 2 Wharton, *Criminal Evidence* §470 at 266 (12th ed. 1955). The generally accepted rule is that where adequate justification for the use of such former evidence exists and a necessity for its use is shown, the testimony of a witness at a prior examination or a former trial is admissible at a subsequent trial.

The rule is aptly stated in *Lindsay* v. *State,* 2 Md.App. 330, 234 A.2d 479 (1967). There the court said, referring to the use at a subsequent trial of evidence adduced at a prior trial: "The admission of such testimony is, of course, quite proper if it is shown that the witness is dead, insane,

Washington and down to either New York or Miami, Florida. I went to Miami, Florida and Miami Beach and I then traced her back to New England. At this time I am still looking for her."

or beyond the jurisdiction of the court, or on diligent inquiry cannot be located, or that some other circumstance exists which shows that the witness cannot be procured as a witness at the second trial, *Contee* v. *State*, 229 Md. 486, 184 A.2d 823, *cert. denied* 374 U. S. 841, 83 S.Ct. 1895, 10 L.Ed.2d 1062. There must, however, be sufficient proof of the unavailability of the witness, or, in other words, a proper predicate must be established." *Id.* at 331, 234 A.2d at 480; *accord, State* v. *Weinrib*, 140 Conn. 247, 99 A.2d 145 (1953); *State* v. *Brown*, 181 Kan. 375, 312 P.2d 832 (1957); *People* v. *Perez*, 170 Cal.App.2d 27, 338 P.2d 255 (Dist. Ct. App. 1959) (statute); *see California* v. *Green*, 399 U. S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

Generally, the decision as to whether these conditions have been met presents a preliminary question for the trial court's determination. "The admission of the evidence, therefore, rests within the sound discretion of the court and its exercise thereof will only be overruled when abused." *State* v. *Weinrib, supra* at 252, 99 A.2d at 148; *accord, Stearsman* v. *State*, 237 Ind. 149, 143 N.E.2d 81 (1957); *Commonwealth* v. *Miller*, 203 Pa.Super. 511, 201 A.2d 256 (1964).

We are unable to perceive any sound reason for the exclusion from evidence in a subsequent judicial proceeding of the former testimony of a now unavailable witness given at a prior judicial proceeding. We now hold that where the moving party establishes that on diligent inquiry the witness cannot be located or, by reason of death, mental incompetence, or absence from the jurisdiction, the witness is unavailable, the former testimony of that unavailable witness may, in the sound judicial discretion of the court, be admitted into evidence at the subsequent hearing. The evidence for which admission is sought must be shown to have been competent and admissible and to have been adduced in the course of a prior judicial proceeding in which

the defendant was present, represented by counsel, and in the course thereof provided with an opportunity to adequately cross-examine the witness. It is also essential to the admissibility of such former testimony that it be preserved by the stenographic notes of a court reporter or a properly authenticated copy of the transcript of the evidence or any other authorized method of recording the testimony or other doings in the course of trial. *See* 2 Wharton, *Criminal Evidence* §490 at 305-09 (12th ed. 1955).

We turn, then, to defendants' contention that the trial court erred in admitting the former testimony of St. Rock at the trial. They argue, first, that the prosecution had failed to establish the essential predicate as to the unavailability of St. Rock in that it did not show that reasonable diligence had been exercised in attempting to produce her for in-court testimony. The question of whether reasonable diligence was used in efforts to locate the missing witness is addressed to the sound discretion of the trial court, and, as we have said, that discretion will not be interfered with upon appeal unless an abuse thereof is affirmatively shown. *Davis* v. *State,* 171 Neb. 333, 106 N.W.2d 490 (1960).

Here the trial justice found specifically that St. Rock " * * * is not available as a witness and the State has exercised all due diligence in trying to get her." Obviously, the phrase "due diligence" is not, in this context, susceptible to precise definition. Whether due diligence has been exercised is a matter to be determined on a case-to-case basis by the trial justice. We have carefully examined the testimony of both the prosecutor and Lieutenant O'Connell of the Providence police. In our opinion, their testimony adequately discloses an intensive search for St. Rock over an extended area both in and out of the state and suffices to establish the state's exercise of due diligence in the prosecution of the search. The trial justice, in our opinion, did not abuse his discretion in finding that to be so. Evidence of a

search for a missing witness quite similar in character to that disclosed in the instant case has been held to establish an exercise of due diligence. *State* v. *Washington,* 206 Kan. 336, 338-39, 479 P.2d 833, 835-36 (1971); *Davis* v. *State, supra.* We find no abuse of discertion in the action of the trial justice.

The defendants further contend that, even if the witness St. Rock's unavailability had been established, her prior testimony had been admitted in violation of their right of confrontation. They argue, first, that they were denied an opportunity to conduct an adequate cross-examination of the witness St. Rock and, second, that the action of the trial justice in barring inquiry at the earlier bail hearings into other matters rendered the cross-examination at those hearings inadequate.

Basically, the confrontation clause is not violated by the admission at a subsequent hearing of the prior testimony of the unavailable witness where at the prior hearing the opportunity for adequate cross-examination was afforded him. *Mancusi* v. *Stubbs,* 408 U. S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293, 301 (1972); *Dutton* v. *Evans,* 400 U. S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213, 227 (1970); *California* v. *Green, supra* at 162, 90 S.Ct. at 1937, 26 L.Ed.2d at 499 (1970); *Pointer* v. *Texas,* 380 U. S. 400, 407, 85 S.Ct. 1065, 1069-70, 13 L.Ed.2d 923, 928 (1965); *Stearsman* v. *State, supra; Britton* v. *State,* 2 Md.App. 285, 234 A.2d 274 (1967); *State* v. *Grierson,* 96 N. H. 36, 69 A.2d 851 (1949); *see also* 5 Wigmore, *Evidence* §1370 at 50 (3d ed. 1940).

Each defendant contends that he did not have an opportunity to cross-examine St. Rock as she testified at the bail hearing of his codefendant. The record discloses that Ouimette surrendered to the Providence police on October 22, 1969, the day following the killing. About a week thereafter he filed his petition for habeas corpus to be admitted

to bail, which was heard and denied on October 29, 1969. St. Rock testified at this hearing, and counsel for Ouimette conducted a substantial cross-examination of the witness St. Rock.

Sweet, however, was not a party to that proceeding and was not represented thereat, having been a fugitive from justice at the time that the Ouimette bail hearing was held. Subsequently, Sweet, who was apprehended in New York City, filed his petition for habeas corpus to be admitted to bail, which was heard and denied on February 11, 1970. Again, St. Rock testified at Sweet's bail hearing, and again it is not questioned that counsel for Sweet cross-examined the witness St. Rock. Ouimette, who was not a party to this proceeding, was not present and did not cross-examine St. Rock.

It is our opinion that each defendant, through counsel, was afforded an opportunity to adequately cross-examine St. Rock at prior proceedings. It is clear from the record that the testimony given by St. Rock at each of the prior bail hearings was substantially the same.

What is essential is that the defendant was afforded an opportunity to conduct an *adequate* cross-examination of the now unavailable witness. Fundamentally, the adequacy of prior cross-examination, where afforded, depends upon an identity of issues and parties at the two proceedings. By strictly applying this rule, many jurisdictions have brought about the exclusion of prior testimony. However, we follow the so-called liberal rule, which requires only a substantial identity of issues and parties in order to permit the introduction of prior testimony of the unavailable witness at the subsequent proceeding. *People* v. *Jackson*, 41 Ill.2d 102, 242 N.E.2d 160 (1968); 5 Wigmore, *Evidence* §1386 at 82-83 (3d ed. 1940). A substantial identity of issues is of primary importance to the application of the rule. Absent such an identity of issues, it cannot be pre-

sumed that the prior testimony was sufficiently tested by the prior cross-examination.

A substantial identity of parties is also required; however, the determinative factor is the identity of the issue that was tested by cross-examination with the identity of the issue raised at the subsequent proceeding. The identity of the parties under the liberal rule is to be considered more or less secondary, provided that cross-examination at the prior proceeding was dictated by the same interests and motives as would be the cross-examination of the witness were he present at the subsequent proceeding.[2]

The existence of a substantial identity of the issues here involved is clear. At each bail hearing the purpose of the testimony adduced through St. Rock was to identify defendants and to place them at the scene of the killing on the evening of October 21. This was also the issue at the trial. It is likewise clear that there was an identity of the parties in each case and that each defendant, through his counsel, conducted a substantial cross-examination of St. Rock's testimony relating to the pertinent issue. We conclude, then, that each defendant was given an opportunity to conduct an adequate cross-examination of the witness St. Rock at his own bail hearing and that, therefore, the prior testimony of that witness was properly admitted at the subsequent trial of defendants.

We must reject the further contention of defendants that cross-examination of St. Rock in the course of their respective bail hearings was so limited in scope by evidentiary rulings of the trial justice that it was rendered inade-

---

[2]The reason underlying this view is stated by Wigmore as follows: "The principle, then, is that where the interest of the person was calculated to induce equally as thorough a testing by cross-examination, then the present opponent has had adequate protection for the same end. Thus, the requirement of identity of parties is after all only an incident or corollary of the requirement as to identity of issue." 5 Wigmore, *Evidence* §1388 at 95 (3d ed. 1940).

quate. The right of confrontation is not of constitutional origin. It was a right that existed at common law and had recognized exceptions. The Supreme Court of the United States has frequently said that its objective is to continue and preserve the common-law right and not to broaden that right or disturb the exceptions thereto. *Salinger* v. *United States,* 272 U. S. 542, 548, 47 S.Ct. 173, 175, 71 L.Ed. 398, 402 (1926). The same policy was made applicable to the states by the fourteenth amendment. *Parker* v. *Gladden,* 385 U. S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966); *Pointer* v. *Texas, supra.*

The conferring of constitutional status on the common-law right of confrontation did not abrogate the rules of evidence. It was intended only to secure to the defendant the right to be confronted by the witnesses who are produced to prove such matters as are competent evidence against him under the settled principles of law. *State* v. *Guaraneri,* 59 R. I. 173, 181-82, 194 A. 589, 593 (1937); *State* v. *Ackerman,* 49 R. I. 482, 485-86, 144 A. 150, 151 (1929).

We have closely scrutinized the evidentiary rulings of the trial justice to which defendant has directed our attention. These rulings rested on the rather obvious irrelevance of the line of testimony sought to be introduced and, under the pertinent rules of evidence, were properly excluded for want of competence.

## II

In the course of trial, defendants produced witnesses who testified that Choiniere and St. Rock had made out-of-court statements inconsistent with their testimony at the trial in which they identified defendants and placed them on Althea Street at the time of the homicide. One of these witnesses testified that Choiniere had told them that "she did not see who was in the car." Another testified that she told one of these witnesses that she had been talking to St. Rock and did not see the men in the car because "her

back was against the door." Another witness testified that sometime after October 29, St. Rock had told him that "* * * she wasn't sure it was them two men that was the ones that shot him."

Thereafter, the court permitted the state to introduce into evidence statements allegedly made by Choiniere and St. Rock which were consistent with their prior testimony both as to the identity of defendants and their presence at the scene of the killing. One of the so-called consistent statements had been made by Choiniere to her brother on the night of the murder, in which she said that she saw the men in the other car and never indicated that she could not identify them. The court also admitted testimony of two other witnesses that they had talked with St. Rock after the funeral of the victim and that she had told them that defendants were the men who were in the other car. The trial justice admitted their testimony on the ground that they constituted prior consistent statements and were admissible for the purpose of rehabilitating a witness who had been impeached.

Generally, the rule has been that testimony intended to buttress the in-court testimony of a witness by showing that he had made prior out-of-court statements consistent with his in-court testimony is inadmissible. In recent years, however, the courts have increasingly accepted the view that an exception should be made where a witness has been impeached by the introduction of testimony that he made statements inconsistent with his in-court testimony. In such cases the courts were more liberal in admitting into evidence prior consistent statements for the purpose of rehabilitating the impeached witness. The courts accepting this view emphasize that testimony regarding such prior consistent statements is admissible only to rehabilitate the credibility of the witness and not to prove essential facts in issue. *Wisniewski* v. *State,* 51 Del.

84, 97, 138 A.2d 333, 341 (1957); *People* v. *Neely,* 163 Cal.App.2d 289, 329 P.2d 357 (Dist. Ct. App. 1958); *State* v. *Griffin,* 19 N.J.Super. 581, 587-88, 89 A.2d 67, 70 (1952); 4 Wigmore, *Evidence* §1124 at 194-95, §1126 at 198 (3d ed. 1940); Annot. 75 A.L.R.2d 909, §§15-16 at 930-34 (1961).

We know of no sound reason for holding inadmissible the testimony as to prior consistent statements where there has been an attempt to impeach or discredit a witness by testimony purporting to show that the witness had made prior statements inconsistent with his in-court testimony. Such evidence of prior consistent statements, in our opinion, should be admissible where a witness has in fact been impeached by testimony of prior inconsistent statements and has not admitted that such inconsistent statements had been made. Inasmuch as the function of the jury is to seek the truth, testimony that tends to rehabilitate the veracity of the witness is relevant and material on the issue of credibility and should be admitted. *State* v. *Sibert,* 6 Utah 2d 198, 203, 310 P.2d 388, 391-92 (1957). The admission of such testimony of prior consistent statements, however, is addressed to the sound judicial discretion of the court. If the court is satisfied that the credibility of the witness was impeached in such a manner and to such an extent that he feels that evidence should be admitted to rehabilitate the credibility of the witness, his admission thereof is not an abuse of his discretion. *Thomas* v. *Ganezer,* 137 Conn. 415, 420, 78 A.2d 539, 542 (1951); *Wisniewski* v. *State, supra.*

Applying this rule to the instant case, we note that the credibility of the witnesses, Choiniere and St. Rock, was impeached by defendants' introduction of their alleged prior inconsistent statements. Nothing in the record discloses that either of them admitted making such statements. In this circumstance it appears to us that it is in the interest of justice to permit the jury to weigh any available relevant evidence going to the rehabilitation of their credibility. The

testimony as to the prior consistent statements of the witnesses was admissible in an exercise of the sound judicial discretion of the trial justice. We cannot say that the admission of the testimony constituted an abuse of that discretion.

The defendants also contend that the testimony admitted as prior consistent statements was without probative force and that its admission could only tend to confuse and mislead the jury. That the testimony admitted as prior consistent statements was of questionable probative force we concede. The negative character of such purported prior consistent statements could very well minimize the weight a jury would give it. However, for the purpose of rehabilitating the credibility of Choiniere and St. Rock, the statements are relevant and material evidence. That being so, it is our opinion that the trial justice did not err in admitting the prior consistent statements into evidence.

## III

The trial justice denied motions made by defendants for the production of the minutes of the grand jury in which the testimony of the witness Choiniere was contained and for the production of certain statements made to the Providence police by her prior to trial. The defendants now contend that the denial of these motions constituted reversible error.

They urge that the denial of their motions for an inspection of the grand jury minutes was error, relying substantially on *Pittsburgh Plate Glass Co.* v. *United States,* 360 U. S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959), and *Dennis* v. *United States,* 384 U. S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). From an examination of the opinions in *Pittsburgh* and *Dennis,* as well as in numerous other cases, we reach certain basic conclusions concerning the standards governing the granting of motions to inspect grand jury minutes.

In the first place, a defendant is not entitled as of right to an inspection of grand jury minutes, a motion for such inspection being addressed to the sound judicial discretion of the trial court. *Pittsburgh Plate Glass Co.* v. *United States, supra* at 399, 79 S.Ct. at 1240, 3 L.Ed.2d at 1326. Secondly, we conclude that under the generally accepted and, in our opinion, better view, a defendant need not show as a condition precedent to the granting of such a motion that an actual inconsistency exists between the testimony given by the witness at trial and that given by him before the grand jury. *Id.* at 400-01, 79 S.Ct. at 1241, 3 L.Ed.2d at 1327. Lastly, the burden is on the defendant to show that there is a "particularized need" for such an inspection of grand jury minutes that outweighs the necessity for the maintenance of grand jury secrecy. *Id.* at 400, 79 S.Ct. at 1241, 3 L.Ed.2d at 1327.

Thus, in order to obtain permission to inspect grand jury minutes, defendants need not show actual inconsistencies between the testimony of a witness at the grand jury and at the trial, but they must establish a particularized need for such an inspection. A particularized need may be shown when the defendants establish to the court's satisfaction that extraneous circumstances provide reasonable grounds for belief that the testimony of the witness might be vulnerable to impeachment on cross-examination by reason of potential inconsistencies that might be disclosed upon an adequate inspection of the minutes by the defendants' counsel. The defendants in the instant case, however, have failed to show the existence of this particularized need.[3]

[3]It should be noted that in *Dennis* v. *United States,* 384 U. S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), Justice Fortas indicates that, upon a showing of a particularized need, defense counsel should have access to relevant portions of the grand jury testimony of a trial witness. We agree that "[t]rial judges ought not to be burdened with the task or the

In seeking review of the ruling of the trial justice in denying such a motion, it is not enough to direct this court's attention to evidence that would serve the aforesaid purpose. It is the trial justice who must be thus informed at the time that the motion to inspect grand jury minutes is made, for it is then that his judicial discretion is invoked and exercised. A judgment as to whether he abused that discretion will, of course, turn upon whether defense counsel had met the burden of establishing the need for such an inspection on the basis of the evidence that had been adduced during trial. We again repeat that nothing in the record indicates that defense counsel at the time of arguing in support of his motion met the burden of showing a particularized need and, therefore, we conclude that the trial justice did not abuse his discretion in denying defendants' motions for an inspection of the minutes of the grand jury.

On two occasions counsel for defendants moved that they be provided with copies of the statements alleged to have been made by the witness, Choiniere, to the Providence police, one on October 21, 1969, and the other on October 31, 1969. The record discloses that on a prior occasion during the course of trial the trial justice agreed to read in camera all statements that had been made by the witness, St. Rock, in order to determine whether any material con-

---

responsibility of examining sometimes voluminous grand jury testimony in order to ascertain inconsistencies with trial testimony." In addition, it is not "* * * realistic to assume that the trial court's judgment as to the utility of material for impeachment or other legitimate purposes, however conscientiously made, would exhaust the possibilities. In our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate." *Id.* at 874-75, 86 S.Ct. at 1851, 16 L.Ed.2d at 986.

tained therein should be made available to defendants for purposes of impeachment.[4]

At that time counsel for defendants requested that the court also read the prior statements of the witness, Choiniere. This the court declined to do. Later in the trial, while testimony was being given by Dennis Paul Greene, a brother of the victim, defense counsel again moved for the production of the statement taken by the Providence police from Choiniere as above described. Counsel specifically requested that he be provided with a copy of the statement taken from Choiniere by the Providence police, "[o]r, in the alternative, the Court to read the statement in camera." The trial justice replied that he would ask the Attorney General for any and all statements of Miss Choiniere that were reduced to writing, "* * * and I will treat them the same as I did the St. Rock statements. I will read them in camera."

The record discloses, then, that the motion made was in the alternate and that it was granted in the alternate by the trial justice when he agreed to read Choiniere's statements in camera. This, in our opinion, rendered harmless any error involved in prior denials by the court of motions for the production of statements by Choiniere to the police. However, it is clear that, so far as we can ascertain from the record, the only motion made was granted.

A close examination of the record here fails to disclose any action on the part of the trial justice such as the action

---

[4]It appears from the transcript that when court opened on the following morning, the trial justice informed counsel for defendants that he had read photocopies of three statements signed by Donna M. St. Rock. He then went on to say specifically: "Nothing exculpatory in any. All incriminatory. No impeachment material." He then went on to state that he had enclosed a copy of the statements he had read in an envelope, sealed it, and directed that it be filed with the papers in the case and be made available to the Supreme Court on review.

he took immediately after having read in camera the St. Rock statements that would be consequential to his having read the Choiniere statements in camera. Neither have defendants directed our attention to anything in the record that would disclose that the court undertook such action. In such circumstances, it is our opinion that it was the obligation of defendants to address an appropriate motion to the court which would clearly and expressly reveal a desire to have the court dispose of the conclusions it reached after scrutiny of the statements in camera.

In *Manekofsky* v. *Baker,* 92 R. I. 377, 169 A.2d 376 (1961), we noted that where trial counsel desires an exercise of the trial court's judicial discretion, it is his obligation to invoke such action through the medium of an appropriate motion wherein the purpose thereof is clearly and expressly stated. Nothing in the record indicates that such a motion was made with respect to an exercise of discretion to make the contents thereof available to defendants for impeachment purposes. There was no ruling by the court that would be subject to a valid exception requiring us to review the court's exercise of discretion.

## IV

It is not disputed that on October 31, 1969, 10 days after the slaying, the witness, Choiniere, went to Providence police headquarters for the purpose of making a statement concerning what transpired on the night of October 21. While there, she was shown four photographs and identified two of them as being photographs of the respective defendants. It is conceded that there appeared among the four photographs one picture of each defendant. Subsequently, on May 27, 1970, just prior to trial, she attended two lineups at the Adult Correctional Institutions, where she again identified each defendant as having been on Althea Street on the evening of October 21.

During the trial, Choiniere, while testifying, descended from the stand at the request of counsel and pointed to Ouimette, identifying him as the driver of the car, and, pointing to Sweet, identified him as the passenger therein. The defendants vigorously objected to the admission into evidence of this in-court identification made by the witness, Choiniere.

In urging the inadmissibility of the in-court identification, they rely on *Stovall* v. *Denno,* 388 U. S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). There the Court held that where an identification is made under circumstances so unnecessarily suggestive or conducive to irreparable mistaken identity, the defendant has been denied due process of law under the fourteenth amendment. The Court said at 302, 87 S.Ct. at 1972, 18 L.Ed.2d at 1206: "This is a recognized ground of attack upon a conviction independent of any right to counsel claim." It is important to note, however, that whether the identification circumstances amount to a denial of due process of law in the conduct thereof is dependent upon the "totality of the circumstances surrounding it."

The defendants' challenge to the admissibility of the in-court identification, as we understand it, rests upon the contention that the violation of the constitutional right to due process in the course of the identification on October 31 at Providence police headquarters taints any subsequent identifications made by the witness Choiniere including those made at the lineups at the Adult Correctional Institutions, as well as her in-court identifications.

The controlling question here, in our opinion, is whether the identification that resulted from Choiniere's examination of photographs at the Providence police headquarters on October 31 was, in view of *Stovall* v. *Denno, supra,* violative of defendants' fourteenth-amendment right to due process of law. We think not. We cannot agree that the circumstances under which Choiniere identified defendants

from the photographs were so unnecessarily suggestive as to be conducive to irreparable mistaken identification and thus deny defendants due process of law.

The witness, Choiniere, testified without contradiction that she had gone to headquarters in the company of detectives and for five to six hours assisted in the investigation. During this period, one of the officers, a Sergeant Bathgate, produced the four pictures in question, placed them on a desk, and asked her to look at them and pick out the two men she saw sitting in the car on the night of the murder. The whole procedure, according to the witness, lasted only a few seconds. The photographs were taken away after she had identified defendants. She continued thereafter to assist the police in the investigation of the slaying.

Whether the circumstances surrounding the identification procedure here under consideration were impermissibly suggestive must be determined on the basis of the totality of all the circumstances, *Stovall* v. *Denno, supra,* and each case is to be considered on its own facts, *Simmons* v. *United States,* 390 U. S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968). In *Simmons* several witnesses to a robbery had, through the use of photographs, identified the defendant as a participant. As in this case, the government did not introduce the photographs into evidence but had its witnesses make in-court identifications. The defendant contended, among other things, that his pretrial identification by means of photographs was in the circumstances so unnecessarily suggestive and conducive to misidentification that it denied him due process of law.

There the Court, despite its recognition of the danger of erroneous identifications following an improper use of photographs by the police, declined to bar the employment of such identification procedures. The Court, directing attention to its widespread and effective use in the enforcement of criminal law, precluded its exclusion, saying: "We are

unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253.

We turn, then, to apply these guidelines to the circumstances surrounding the identification of defendants by photographs in this case. In the first place, there is no evidence that the police, in asking Choiniere to identify the photographs, were exerting suggestive pressure on her to identify defendants' photographs or that they were trying to "rig" the procedure so as to secure such an identification of defendants by some ingenious and elaborate mechanism designed to create "unreasonable suggestiveness." It was, rather, to the contrary.

The police, in moving for such an identification, were so casual as to suggest that it was a case where the officer was merely complying with some departmental operating procedure prescribed by department regulations. It actually appeared to be a routine process. So far as the evidence discloses, there was no highlighting of the pictures and no statements made to the witness which would indicate an attempt to suggest to the witness which picture she should indicate.

We think it is fair to consider the want of motivation for establishing an elaborate procedure designed to exert suggestive influences. It is reasonable to assume that, as far as the police were concerned, the matter of identifications reasonably could be considered secure. Ouimette had surrendered the day after the slaying and was in custody;

Sweet, his identity known, was in flight. The witness, Choiniere, had adequate opportunity to observe defendants in the car on Althea Street for a period of minutes just prior to the slaying. It would be unreasonable to assume that the police in such circumstances were so desperate for an identification that they would exert strong suggestive pressure on the witness at this point.

In our opinion, the entire procedure was characterized by a lackadaisical approach that is sufficient to negate the existence of an intent to exercise unreasonable suggestiveness. This procedure can hardly be judged reasonably to have led to a "very substantial likelihood" of a misidentification. It is, then, our conclusion that the circumstances, when viewed in totality, were not impermissibly suggestive during the course of the identification of the photographs and that, in these circumstances, the in-court identifications made by the witness, Choiniere, were not tainted and were properly admitted.

## V

It appears from the evidence that on September 22, 1969, the manager of Goddard Memorial State Park, a state reservation in the city of Warwick, heard gunfire in an area of the park bordering on a small pond to the rear of the maintenance building. He immediately instituted an investigation thereof by members of the park police, a division of the Department of Natural Resources. The investigating officers, on approaching the pond, encountered defendant, Ouimette, and a Mr. and Mrs. Tillinghast walking away from the shore of the pond. At that time the park police searched the persons of both Ouimette and Tillinghast, finding no weapon, but it is conceded that no search was made of Mrs. Tillinghast's person or effects.

It also appears from the evidence that earlier on September 22, Tillinghast, accompanied by Ouimette, had purchased a box of .380 caliber slugs at the Elmwood Sport

Shop in Cranston. During subsequent investigation, the park police discovered a paper carton used to package .380 cartridges, on which was printed the name of Elmwood Sport Shop, floating in the pond. They recovered a number of expended bullets and empty cartridge cases in that same area. All of these ultimately were turned over to the FBI for examination by ballistics experts, who identified the bullets and cartridge cases as ammunition to be used in a .380 semi-automatic pistol.

Subsequently, the evidence discloses that one Charles L. Killion, a member of the FBI who qualified as a ballistics expert, testified that after examination it was his conclusion that the bullets found in Goddard Park at the shore of the pond and those that killed Greene were fired from the same pistol. He further testified that those shells were fired from the pistol which was subsequently identified as one found on the highway not far from the scene of the slaying on Althea Street on the night of October 21.

The testimony to which reference is made above was admitted over defendants' objection, and the motion of defendants to strike such testimony was denied. Exceptions were taken to the denial of the motion to strike, but it is clear from defendants' brief that these exceptions were not pursued either by briefing or by oral argument. They are, therefore, waived.

However, an exception was taken by defendants to the admission into evidence as a full exhibit of defendants' Exhibit 46, a paper box labeled with the name Elmwood Sport Shop, which was identified as a box that would contain 50 .380 cartridges. The witness, a clerk in that store, testified that he had sold Tillinghast such a box containing 50 cartridges and that at that time he was accompanied by Ouimette on September 22, 1969.

Counsel for defendants at this point raised the question of whether the evidence above referred to and the exhibit,

if admitted, would support a reasonable inference that would link Ouimette and Sweet to the possession of the murder weapon. In defendants' brief a rather lengthy argument is made that the evidence is not sufficient to support a reasonable inference linking defendants to the murder weapon. With this contention we are unable to agree.

## VI

The testimony of Mrs. Helen Greene, the mother of the victim, was adduced by the state to rebut defendant Ouimette's testimony that he was friendly with the deceased. The state intended to show through statements of the deceased made to his mother shortly before his death the absence of that friendly relationship between himself and Ouimette. The defense contends that throughout the course of her testimony Mrs. Greene's remarks were inflammatory and prejudicial and, although stricken from the record, could not be removed from the jurors' minds. Therefore, defendant Ouimette argues that, by refusing to grant his motion to pass the case, the trial justice abused his discretion.

The defendant suggests that the United States Supreme Court decision in *Bruton* v. *United States*, 391 U. S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), is controlling. We need not spend a great deal of time distinguishing the factual circumstances in *Bruton* from those presented here. However, we will point out that the *Bruton* case involved the admission of the confession of an accomplice implicating his codefendant. It is clear that a jury of laymen might find it very difficult to disregard such a telling piece of evidence.

The circumstances of this case are quite different. The remarks made by the victim's mother refer only to the state of mind of her son before his death. The jury was instructed specifically to disregard these remarks. In addition, the substance of many of these remarks was admitted into evidence during the testimony of Jeffrey T. Greene, a brother

of the victim. In *Bruton* the Court held: "Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. * * * It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information." *Id.* at 135, 88 S.Ct. at 1627, 20 L.Ed.2d at 484-85.

Bruton's conviction was reversed only because the Court concluded that in the particular circumstances of that case the risk that the jury could not follow the trial judge's instructions was so great and the consequences of failure so vital to the defendant that the practical and human limitations of the jury system could not be ignored. The devastating effect on a defendant of a co-defendant's confession implicating him is obvious. The Court further pointed out that the credibility of an accomplice is always suspect because of "the recognized motivation to shift blame onto others." *Id.* at 136, 88 S.Ct. at 1628, 20 L.Ed.2d at 485. In *Bruton* this factor was compounded by the failure of the witness to testify and face cross-examination.

In our opinion, Mrs. Greene's remarks in no way approached the significance of those presented in the *Bruton* context, and the substance of her remarks was before the jury through the testimony of a prior witness. We are unable to conclude that the trial justice abused his discretion in denying defendant Ouimette's motion to pass.

Through the testimony of Lieutenant O'Connell, the state offered evidence of the flight of defendant Sweet. The defendant Ouimette alleges that the introduction of this evidence was highly prejudicial to him inasmuch as the jury was likely to infer from the circumstances the same consciousness of guilt of the co-defendant Ouimette, against whom such evidence is not admissible.

We have held before that evidence of flight may be introduced as a circumstance bearing on the question of guilt to be considered by the jury. *State* v. *Falcone*, 41 R. I. 399, 103 A. 961 (1918); *State* v. *Papa*, 32 R. I. 453, 80 A. 12 (1911). The trial justice took great pains both at the time the evidence of Sweet's flight was presented to the jury and in his charge at the conclusion of the trial to state that such evidence was admissible only as it pertained to defendant Sweet and that no other implications could be drawn by the jury.

Once again, it is clear that the prejudice alleged by defendant Ouimette in no way approaches that which arose under the circumstances of *Bruton*. Therefore, we find no abuse of discretion in the trial justice's denial of Ouimette's motion to sever for this reason.

## VII

The defendant Sweet alleges that certain statements he made to Lieutenant O'Connell shortly after he was apprehended in New York City were improperly admitted at the trial. Lieutenant O'Connell testified that he made an effort, before questioning Sweet, to advise him of his rights as established under *Miranda* v. *Arizona*, 384 U. S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The lieutenant told Sweet of his right to remain silent, his right to an attorney, and his right to have an attorney present during any interrogation. Lieutenant O'Connell testified further that before he had an opportunity to continue, Sweet interrupted, stating: "I know my rights. I have been around and when you're caught, you're caught." Sweet now alleges that Lieutenant O'Connell's failure to advise him of his right to have an attorney provided for him if he were unable to afford one violated the *Miranda* mandate and made any subsequent statements by Sweet to O'Connell inadmissible at trial.

In *Miranda* the Court took great pains to point out that "[a]ny statement given freely and voluntarily without any

compelling influences is, of course, admissible in evidence. * * * Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Id.* at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. During the trial, the judge was required to determine if Sweet's statements were voluntarily made and, therefore, admissible. The trial justice concluded that Sweet had made an intelligent waiver of the warnings and volunteered his statements to Lieutenant O'Connell.

Circumstances very similar to those presented here arose in *State* v. *Wilson,* 26 Ohio App.2d 23, 268 N.E.2d 814 (1971). In that case the defendant interrupted police officers as they advised him of his rights prescribed by *Miranda.* Before they were able to inform him that if he could not afford an attorney, one would be furnished him at state expense, the defendant said: "I don't need a damn lawyer, I done it." The Ohio Court of Appeals held that this statement, absent any contrary circumstances, indicates a clear waiver of the *Miranda* warnings and a voluntary statement by the defendant outside the scope of *Miranda.* The court pointed out: "The incriminating admissions * * * had not been made in response to any question, suggestion, or inquiry; and his statements had been devoid of the impulsion of coercive police conduct, interrogation or atmosphere." *Id.* at 27, 268 N.E.2d at 817. Similarly, in this case nothing in the evidence indicates any coercion or duress. Lieutenant O'Connell's testimony as to the circumstances is uncontradicted. Sweet volunteered: "I know my rights. I have been around and when you're caught, you're caught."

The defendant has failed to point out any basis in the record which might establish that his statements to Lieutenant O'Connell were not voluntarily made; indeed, the facts in the record compel a contrary conclusion. Therefore, we must conclude that the trial justice acted prop-

erly in ruling that the remarks made by the defendant Sweet to Lieutenant O'Connell were admissible.

All of the exceptions of each of the defendants are overruled, and the case is remitted to the Superior Court for further proceedings.

*Richard J. Israel,* Attorney General, *Donald P. Ryan,* Assistant Attorney General, *R. Raymond Greco,* Special Assistant Attorney General, for plaintiff.

*John F. Sheehan,* for defendant Ouimette; *John F. Cicilline,* for defendant Sweet; *Judith E. Hodge,* of counsel, for defendants.